PAUL S. MULLIN & ASSOCIATES, INC., Paul S. Mullin Advisors, Inc., and Mary E. Mullin as Executrix of the Estate of Paul S. Mullin, Plaintiffs,

v.

Joseph M. BASSETT; Arthur Brosius, II; Bassett, Brosius and Associates, Inc.; R.J. Financial Corporation; Investment Management and Research, Inc.; Eagle Asset Management, Inc.; M. Anthony Greene; Herbert Ehlers; et al., Defendants.

Civ. A. No. 85–169 CMW.

United States District Court, D. Delaware.

April 8, 1986.

William J. Wier, Jr. and Joseph G. Krauss of Herlihy & Wier, Wilmington, Del., for plaintiffs.

Allen M. Terrell, Jr. and Robert W. Whetzel of Richards, Layton & Finger, Wilmington, Del.; Thomas C. Harney of Kilpatrick & Cody, Atlanta, Ga., of counsel, for defendants.

## OPINION

CALEB M. WRIGHT, Senior District Judge.

■ Several motions await decision in this case, which arose from the abortive sale of two financial planning corporations. All defendants have filed a motion to dismiss the suit, and defendant Herbert Ehlers additionally seeks dismissal because of allegedly improper service of process and lack of personal jurisdiction. To ward off the possibility of dismissal, plaintiffs also seek to amend their complaint to add a claim under the Investment Company Act, 15 U.S.C. §§ 80a–1–80a–64 (1982).

## I. *The Facts* [1]

Paul S. Mullin operated a financial planning business in Wilmington, Delaware, un-

---

**1.** Because this is a motion to dismiss for failure to state a claim on which relief can be granted, the Court must accept all well-pleaded facts in the complaint as true and make all reasonable inferences in favor of plaintiffs. *D.P. Enterprises, Inc. v. Bucks County Comm. College,* 725 F.2d

til his death on November 3, 1984. Mr. Mullin operated his business through several corporations, of which he was the founder, president, and sole stockholder.

Plaintiff Paul S. Mullin Advisors, Inc. ("Advisors"), performed financial planning services for its clients, including analysis and recommendations regarding investments, retirement programs, tax planning, insurance, etc. To qualify to provide general advice about investments, Advisors registered as an investment adviser with the SEC. Advisors entered into investment adviser contracts with clients and received fees for providing investment advice. Mr. Mullin and defendants Joseph M. Bassett and Arthur Brosius, II were registered agents of Advisors.

Plaintiff Paul S. Mullin & Associates, Inc. ("Associates"), was the vehicle through which Mr. Mullin administered those aspects of his business which required money management services and investment in securities and limited partnerships. Many of these services could be provided only through a broker/dealer registered with the SEC, and Mr. Mullin consequently became an authorized independent sales associate of defendant Investment Management & Research, Inc. ("IM & R"), a registered securities broker/dealer. IM & R operates through individual independent associates and sub-associates, pursuant to written contracts between IM & R and the individual. IM & R entered into a sales associate contract with Mr. Mullin personally. As a result of their affiliation with Mr. Mullin and Associates, defendants Bassett and Brosius entered into sub-associate contracts with IM & R. All commission checks for trades handled by IM & R on behalf of the three men were issued to Mr. Mullin. Mr. Mullin, however, deposited these checks into the Associates account, from which he paid Bassett, Brosius and himself their respective shares of the commissions.

Many customers of Mr. Mullin, upon his recommendation, placed funds for management with Eagle Asset Management, Inc. ("Eagle"), an investment adviser registered with the SEC. Eagle had investment adviser contracts with customers who placed funds with it through Mr. Mullin and IM & R. Such contracts specified, among other things, a securities salesperson (such as Messrs. Mullin, Bassett, or Brosius). IM & R, as broker/dealer, received a commission for trades conducted on behalf of Eagle's clients, and the specified securities salesperson generally received a portion of that commission.

Both Eagle and IM & R are subsidiaries of defendant R.J. Financial Corp. ("R.J. Financial"), parent company of the largest regional brokerage and investment firm in the southeastern part of the country. Another R.J. Financial subsidiary, Raymond, James & Associates, Inc. ("Raymond, James"), is a registered brokerage firm; it conducts securities transactions for accounts managed by Eagle and acts as clearing broker/dealer for IM & R. Defendant M. Anthony Greene is president of IM & R and a director of R.J. Financial. Defendant Herbert Ehlers is president of Eagle and an officer of Raymond, James.

Paul S. Mullin died on November 3, 1984. Ownership of all outstanding stock in both Associates and Advisors passed to his estate, of which his wife, plaintiff Mary E. Mullin, is executrix.

The sales associate agreement between Mr. Mullin and IM & R was to terminate upon the death of Mr. Mullin, unless IM &

943 (3d Cir.1984). The parties here have submitted factual affidavits to supplement their briefs on the dismissal motion. Reliance on such matters outside the pleadings ordinarily would transform the motion to dismiss into a motion for summary judgment. *See* Fed.R. Civ.P. 12(b); *Carter v. Stanton,* 405 U.S. 669, 92 S.Ct. 1232, 31 L.Ed.2d 569 (1972). The Court made use of information in the affidavits in its attempt to describe coherently in this Opinion the complex factual relationship between the various parties. The Court did not consider this information, however, in making its findings on the legal sufficiency of the complaint. Defendants' motion accordingly will be treated (and decided) as one for dismissal. *See JM Mechanical Corp. v. United States,* 716 F.2d 190, 197 (3d Cir.1983); *North Star Intern. v. Arizona Corp. Comm'n.,* 720 F.2d 578, 581–82 (9th Cir.1983).

R approved a successor in writing. On December 11, 1984, Greene, acting on behalf of IM & R, appointed Bassett to assume all supervisory and administrative responsibilities previously fulfilled by Mr. Mullin. Bassett and Brosius continued to service all customer accounts they had previously serviced, as well as those accounts developed and managed exclusively by Mr. Mullin.

In the meantime, Mrs. Mullin, as executrix of her husband's estate, had been negotiating with Bassett and Brosius about purchasing the stock of Advisors and Associates from the estate. At some time prior to December 12, 1984, the parties reached an oral agreement on the sale. Mrs. Mullin wrote a letter on that date to the companies' clients[2] advising them that the business had been sold to Bassett and Brosius. The parties never consummated the proposed sale, evidently because of a failure to reduce the oral agreement to acceptable written form. This breakdown occurred sometime after release of the December 12, 1984, letter.

Using Associates stationery, Brosius wrote to the companies' clients on January 3, 1985, thanking them for their support and advising them to "keep confidence in the firm." He stated further that he would try to reach each client within the next few weeks. At about this time, Bassett and Brosius also engaged in telephone solicitations of the clients.

Mrs. Mullin gave Bassett and Brosius a final written declaration that negotiations for sale of the Mullin companies were terminated on January 8, 1985. She then started negotiations with other potential buyers. The letter terminating negotiations with Bassett and Brosius told them to return any proprietary or confidential client information and to cease all contact with clients.

Bassett and Brosius then organized Bassett, Brosius and Associates, Inc. ("BB & A"), which was registered as a Delaware corporation on January 10, 1985. Bassett and Brosius wrote to the clients on January 14, 1985, using BB & A letterhead, soliciting their business and informing them that BB & A's offices were at the same address and down the hall from the Mullin companies' offices. Bassett and Brosius also continued to telephone clients previously served by the Mullin companies to inform them that the two would continue to provide them with the same services, including the investment services handled through IM & R and Eagle.

At about this time, Mrs. Mullin had negotiated a sale of the Mullin companies to A. Duer Pierce, Jr., and Donald N. Pierce, who executed a purchase agreement for the companies. Shortly thereafter, IM & R and Eagle, through their attorney, directed the Pierces to surrender to Bassett all client investment files maintained by the Mullin companies. IM & R and Eagle claimed these files as their property, to which Bassett, as local agent and representative of IM & R, was entitled. Faced with the possibility of litigation, the Pierces turned over the files in their possession, and therefore did not fulfill their agreement with the Mullin estate to purchase the two Mullin companies. The Mullin estate still owns all stock of the two companies.

The plaintiffs—Advisors, Associates, and Mrs. Mullin, as executrix of the estate of Paul S. Mullin—filed suit here on March 13, 1985. Named as defendants were Bassett, Brosius, BB & A, R.J. Financial, IM & R, Eagle, Greene, Ehlers, and certain unknown individual defendants. All individual defendants were sued in both their official and personal capacities. Earlier the same day, Bassett, Brosius, and BB & A filed suit in the Delaware Court of Chancery against the parties plaintiff here. All claims asserted by plaintiffs in the federal action have been filed as compulsory counterclaims in the state court action. The state court action is stayed, however, pend-

---

**2.** In describing certain parties as "clients" of the Mullin companies or "clients" of IM & R, the Court is not reaching a conclusion about who might have a legal entitlement to do business with these parties.

ing this Court's resolution of defendants' motion to dismiss.

## II. *The Parties' Contentions*

The underlying wrong for which plaintiffs seek redress through this lawsuit is that the defendants allegedly converted to their own use the business operated by Paul S. Mullin before his death, and usurped his clients, "without paying his estate or the businesses a dime." Plaintiffs' Brief in Opposition to Motion to Dismiss at 1, Docket No. 28. According to plaintiffs, the defendants accomplished this feat through a pattern of fraud and manipulation. Plaintiffs allege a myriad number of state and common law offenses, as well as three federal causes of action with which the Court currently is concerned. In particular, plaintiffs assert federal claims under the Investment Advisers Act, 15 U.S.C. §§ 80b–1–80b–21, and the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. §§ 1961–1968, and seek the Court's permission to add a new claim under the Investment Company Act, 15 U.S.C. §§ 80a–1–80a–64.

Defendants, on the other hand, take the position that plaintiffs have claims only under state law, if they have any claims at all. The defendants seek to have the RICO and Investment Advisers Act claims dismissed for failure to state a claim upon which relief can be granted, and ask that plaintiffs' proposed amendment to assert a claim under the Investment Company Act either not be allowed or be dismissed for failure to state a claim. If all federal claims are dismissed, the defendants then request that the Court also dismiss the pendent state law claims.

As will be explained more fully below, the Court will grant defendants' motion to dismiss the federal causes of action. Plaintiffs' motion to add a claim under the Investment Company Act is granted, but the

Court also will dismiss that claim. With the federal causes of action eliminated, the Court will not retain pendent jurisdiction over the state law claims and will send the parties to state court to resolve their differences.

## III. *Discussion*

### A. *Investment Advisers Act*

The complaint alleges that several provisions of the Investment Advisers Act were violated by the appointment of Bassett and BB & A as the registered agent of IM & R,[3] following the death of Mr. Mullin. Bassett's appointment by IM & R violated § 206(4) of the Act, 15 U.S.C. § 80b–6(4), according to plaintiffs, because it effectively breached the contract which Associates had with IM & R and operated as a fraud on the Mullin companies and their clients by conveying the impression that Bassett's business was a lawful continuation of the Mullin businesses. Plaintiffs also claim that Bassett's appointment violated § 203 of the Act, 15 U.S.C. § 80b–3, because Bassett was not registered with the SEC as an investment adviser.[4] The complaint asks that the contract between IM & R and BB & A be rescinded and plaintiffs receive restitution for damages incurred.

The U.S. Supreme Court decision in *Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), provides the foundation for any discussion of the private reach of the Investment Advisers Act. In *TAMA*, the Court held that a private right of action existed under § 215 of the Act, 15 U.S.C. § 80b–15, for rescission of investment advisers contract and restitution of consideration given under the contract. The Act conferred no other private causes of action, however. *Id.* at 14. Although they claim that the *TAMA* holding supports

---

**3.** The plaintiffs refer both to contracts between IM & R and BB&A and between IM & R and Bassett. The Court's disposition of the Investment Advisers Act claim does not depend on whether it was BB&A or Bassett who contracted with IM & R.

**4.** The plaintiffs have not pressed this latter claim in their briefs, and the Court will not consider it.

their position, plaintiffs in reality run afoul of *TAMA* in several respects.

█ The only investment adviser contracts in this case were those between Advisors and its clients and between Eagle and its clients. Plaintiffs do not seek rescission of any of those contracts, but use them as a vehicle to invoke the Investment Advisers Act. In particular, plaintiffs argue that IM & R's appointment of Bassett to the position formerly held by Mr. Mullin interfered unlawfully with the investment adviser contracts between Advisors and its clients, and they seek therefore to have it voided under the Act. The contract between IM & R and Bassett is not an investment adviser contract. *TAMA* makes clear that the only type of contract that can be voided under § 215 is an investment adviser contract. *TAMA*, 444 U.S. at 24, 100 S.Ct. at 249; *Wang v. Gordon*, 715 F.2d 1187 (7th Cir.1983) (no right of action existed under § 215 where no investment adviser contract was at issue). Regardless of how much the IM & R-Bassett contract may have interfered with Advisors' relationship with its clients, plaintiffs simply cannot use the Investment Advisers Act to attack this contract because it is not an investment adviser contract.

█ Plaintiffs face an equally serious problem because they are not in an investment adviser-client relationship with any of the defendants. Courts have held uniformly that only an investment adviser and its clients (or prospective clients) are proper parties in a private suit under the Act. *See, e.g., Margaret Hall Found. v. Atlantic Fin. Mgmt.*, 572 F.Supp. 1475, 1485 (D.Mass.1983) (lawsuit under Act can be maintained only between parties to investment adviser contract); *Reserve Mgmt. Corp. v. Anchor Daily Income Fund*, 459 F.Supp. 597, 608 (S.D.N.Y.1978) (adviser-client relationship "essential" to any suit brought under the Act); *Halle & Stieglitz, Filor, Bullard, Inc. v. Empress Int'l, Ltd.*, 442 F.Supp. 217, 228 (D.Del.1977) (defendant, who did not have adviser-client relationship with plaintiff, could not bring Investment Advisers Act counterclaim on

behalf of third parties who were plaintiffs' clients); *Gross v. Diversified Mortgage Investors*, 431 F.Supp. 1080, 1095 (S.D.N.Y. 1977) (Act on its face limits standing to client or prospective client of investment adviser), *aff'd.*, 636 F.2d 1201 (2d Cir.1980). The Supreme Court in *TAMA* indirectly ratified this position through its holding that rescission was the only private remedy available under the Act. Obviously, only the parties to a contract can avail themselves of the remedy of rescission. Plaintiffs, therefore, lack standing to sue under the Act because they do not stand in an investment adviser-client relationship with any of the defendants.

█ For similar reasons, only an investment adviser or client properly are defendants in a suit under the Act. *See Wang v. Gordon*, 715 F.2d 1187 (7th Cir.1983); *Margaret Hall Found.*, 572 F.Supp. at 1485 (dismissing claims against defendants who were not parties to investment adviser contract); *In re Catanella and E.F. Hutton & Co. Securities Litigation*, 583 F.Supp. 1388, 1419 (E.D.Pa.1984) (only investment advisers can be sued under Act). Only one of the defendants here, Eagle, is a registered investment adviser. Assuming that there were no other problems with plaintiffs' claim, Eagle is the only party against whom they could maintain suit under the Act.

█ The final failing of plaintiffs' claim under the Investment Advisers Act is the remedy sought. In addition to rescission of the IM & R-Bassett contract, plaintiffs seek damages. *TAMA* specifically states, however, that the only compensation available under the Act is restitution of consideration given under the investment adviser contract, less any value conferred. 444 U.S. at 24 n. 14, 100 S.Ct. at 249 n. 14. Plaintiffs paid no consideration to defendants, and *TAMA* forecloses recovery of any other compensation.

In summary, Count IV of plaintiffs' complaint, alleging violations of the Investment Advisers Act, must be dismissed. Not only do plaintiffs lack standing to sue under the

**538**

Act, but also they are suing improper defendants, over the wrong contract, seeking a forbidden remedy.

### B. Investment Company Act

Plaintiffs allege violations of three sections of the Investment Company Act (ICA). Plaintiffs first assert a claim for breach of fiduciary duty under § 36 of the Act, 15 U.S.C. § 80a–35(b), which provides an explicit private right of action in certain circumstances. Plaintiffs also ask the Court to imply private rights of action for larceny and embezzlement under § 37, 15 U.S.C. § 80a–36, and for inducing others to violate the Act under § 48, 15 U.S.C. § 80a–47. Plaintiffs seek rescission of any contracts between IM & R and Bassett, Brosius, or BB & A, restitution, and an injunction prohibiting defendants from further solicitation of plaintiffs' clients.

Plaintiffs' claim under the ICA may contain as many deficiencies as their claim under the Investment Advisers Act. For instance, defendants claim that none of the parties is an investment company, as defined by the Act, so that the ICA has no relevance to the lawsuit. Plaintiffs' response does not parry this argument, statutory section by statutory section, but simply asserts that at least one of the defendants must fall within the coverage of the ICA.

Additionally, defendants correctly point out that a private cause of action might not exist under the ICA. Although courts once had taken a liberal attitude toward implying private rights of action under the ICA, see, e.g., Brown v. Bullock, 294 F.2d 415 (2d Cir.1961); Taussig v. Wellington Fund, Inc., 313 F.2d 472 (3d Cir.), cert. denied, 374 U.S. 806, 83 S.Ct. 1693, 10 L.Ed.2d 1031 (1963), U.S. Supreme Court decisions from the late 1970's, such as

*TAMA*, took a restrictive view of implied rights of action. The existence of any implied right of action under the ICA thus is subject to debate. See, e.g., Fogel v. Chestnutt, 668 F.2d 100, 109–112 (2d Cir.1981) (discussing whether private right of action under ICA existed in light of Supreme Court decision in *TAMA*), cert. denied, 459 U.S. 828, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982); Note, *Implied Private Rights of Action Under the Investment Company Act of 1940*, 40 Wash. & Lee L.Rev. 1069 (1983) (reviewing recent Supreme Court decisions and concluding that courts should continue to imply private remedy under ICA).

However, any attempt to divine whether an implied right of action exists under the ICA or to sift through the Act's lengthy definition of what is and is not an "investment company" would be simply beside the point. Plaintiffs' claim under the ICA has one simple and fatal failing: plaintiffs are not shareholders of any of the defendants.

Plaintiffs claim that defendants violated § 36 of the Act, 15 U.S.C. § 80a–35(b). Section 36 is the only section of the ICA which explicitly grants a private right of action. It allows "a security holder" of a registered investment company to bring an action on behalf of the investment company, and claim breach of fiduciary duty in relation to payments made to the company's investment adviser. 15 U.S.C. § 80a–35(b). Assuming plaintiffs fulfill the other requirements of this section, they do not allege that they are security holders of any of the defendants and thus cannot avail themselves of the § 36 cause of action.

A similar problem exists in relation to those provisions of the ICA where plaintiffs ask the Court to imply a private cause of action: § 37, § 48, and (perhaps) § 36.[5] Courts which have recognized an implied right of action under various sections of

---

5. At least one court has recognized an implied private right of action under § 36 in addition to the explicit private remedy provided in the statute. *Markowitz v. Brody*, 90 F.R.D. 542, 557 n. 12 (S.D.N.Y.1981) (mutual fund could have implied right of action under § 36(b) against its investment adviser); *but see Tarlov v. Paine Webber Cashfund, Inc.*, 559 F.Supp. 429, 437

(D.Conn.1983) (explicit remedy provided by § 36(b) is sole private remedy available). The plaintiffs' complaint does not specify whether they seek to avail themselves of the express § 36(b) remedy or an implied right of action under the section. The Court will give plaintiffs the benefit of the doubt and construe their complaint as seeking both.

the ICA have required that the party seeking to assert that right of action be a shareholder of the investment company-defendant. *See, e.g., Dandorph v. Fahnestock & Co.,* 462 F.Supp. 961, 965 (D.Conn. 1979) (plaintiff who does not hold stock in investment company lacks standing to sue under ICA); *Reserve Mgmt. v. Anchor Daily Income Fund,* 459 F.Supp. 597, 608 (S.D.N.Y.1978) (same); *Goodall v. Columbia Ventures, Inc.,* 374 F.Supp. 1324, 1328–29 (S.D.N.Y.1974) (plaintiff who was not shareholder of investment company lacked standing under ICA because of failure to show that he was member of class Congress wanted to protect with the Act or that he had suffered harm actionable under it); *cf. Markowitz v. Brody,* 90 F.R.D. 542, 550 (S.D.N.Y.1981) (plaintiff's failure to allege that he was shareholder of investment company at time of challenged incidents requires court to dismiss complaint). Plaintiffs here do not claim to be shareholders of any of the defendants and, as a result, lack standing to maintain a suit under the ICA. The Court, therefore, dismisses Count XIV of the complaint.

*C. RICO*

█ Plaintiffs' claim under RICO alleges that the defendants participated in a scheme to deprive plaintiffs of commission income through various fraudulent representations by mail and telephone. The RICO count does not state exactly what constituted this fraud, but the Court can obtain guidance from plaintiffs' allegations of common law fraud. Under that count (Count VII), plaintiffs allege that defendants, from January 10, 1985, until the present, have made the fraudulent representation that BB & A is the lawful successor to Associates. More particularly, defendants supposedly obtained the client lists and files of the Mullin companies unlawfully and solicited those clients to

switch their accounts to BB & A in a fraudulent manner. *See* Complaint ¶¶ 73, 74, Docket No. 11.

The defendants make two basic arguments why plaintiffs' RICO claims should be dismissed. First, they attempt to demonstrate that the incidents cited by plaintiffs as examples of mail or wire fraud simply were not fraudulent, so that plaintiffs have not established the predicate acts necessary for a RICO claim. Second, assuming that the acts were fraudulent, defendants argue that plaintiffs have not shown the necessary "pattern of racketeering activity," because any fraudulent activities were part of only one racketeering act.

In rebutting these arguments, plaintiffs, like Ali Baba, evidently believe that they can gain access to the treasure trove of RICO liability simply by uttering one magic word: "Sedima." [6] They thus do not address specifically any of the possible flaws in their claim raised by defendants. Unfortunately, the password chosen by plaintiffs, unlike that of Ali Baba in the *Arabian Nights,* does not necessarily open the door to the treasure in this case.

Liability under 18 U.S.C. § 1962(c), the section of RICO on which plaintiffs rely, requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. Plaintiffs must allege each of these elements in order to state a claim. *Sedima, S.P.R.L. v. Imrex Co.,* — U.S. —, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). The "pattern of racketeering activity" which plaintiffs allege consists of the letter about client files that defendants' attorney sent to the Pierces and the various telephone and mail communications from Bassett and Brosius to the Mullin clients in January 1985. The Court finds that one of defendants' acts was not fraudulent as a matter of law, and thus was not "racketeering activity". In addition, the Court finds that the other acts alleged by plain-

---

**6.** *See The Story of Ali Baba and the Forty Thieves,* in Arabian Nights 146 (Grossett & Dunlap ed. 1963). One sentence from plaintiffs' brief contains their entire argument why the RICO count should not be dismissed: "All the arguments to the contrary which were advanced by the defendants were advanced before [*Sedima, S.P.R.L. v. Imrex Co.,* — U.S. —, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)], and have been eliminated by it." Plaintiffs' Brief in Opposition to Motion to Dismiss at 19.

tiffs, assuming that they were fraudulent, do not constitute a "pattern" of racketeering activity.

Among the acts of fraud alleged by plaintiffs is a letter sent by defendants' attorney to the Pierces, who were prospective purchasers of the Mullin companies. This letter stated defendants' position that any files on IM & R and Eagle clients which Mullin had maintained were defendants' property and demanded that these files be turned over to them. Complaint ¶ 31, Docket No. 1. The Court finds absurd plaintiffs' apparent suggestion that a lawyer's act in posting a letter which states a client's legal position in a dispute can constitute mail fraud. If such were the situation, every dispute in which the parties' counsel exchanged letters could give rise to RICO litigation. Such activity simply is not fraudulent. *See Spiegel v. Continental Illinois Nat'l. Bank,* 609 F.Supp. 1083, 1089 (N.D.Ill.1985) (correspondence between attorneys, dealing at arm's length on behalf of clients, concerning issue in pending litigation was not mail fraud under RICO).

The remaining acts of fraud alleged by plaintiffs are defendants' January 1985 telephone calls and letters to the Mullin clients. Section 1961(5) of the RICO statute states that a "pattern of racketeering activity" requires "at least two acts of racketeering activity" one of which occurred after the effective date of this chapter and the last of which occurred within ten years ... after the commission of a prior racketeering activity." 18 U.S.C. § 1961(5). In construing this pattern requirement, some courts had held that two acts of racketeering activity could constitute a "pattern", regardless of how little these acts were related. *See, e.g., United States v. Weisman,* 624 F.2d 1118, 1122–23 (2d Cir.), *cert. denied,* 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980). Dicta in the Supreme Court's decision in *Sedima* suggested that such a broad reading of pattern was unwarranted. Although *Sedima* struck down particular methods some courts had used to limit the scope of RICO,

the Court hinted that simply the means used, and not the end result, had been in error. The Court put partial blame for the "extraordinary uses" to which the RICO statute had been put on "the failure of Congress and the courts to develop a meaningful concept of 'pattern'." *Sedima,* 105 S.Ct. at 3287. Footnote 14 of the opinion took up the "pattern" issue at length, reviewing RICO's legislative history:

> The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern. As the Senate Report explained: "The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern." S.Rep. No. 91–617, p. 158 (1969) (emphasis added). Similarly, the sponsor of the Senate bill, after quoting this portion of the Report, pointed out to his colleagues that "[t]he term 'pattern' itself requires the showing of a relationship.... So, therefore, proof of two acts of racketeering activity, without more, does not establish a pattern...." 116 Cong.Rec. 18940 (1870) (statement of Sen. McClellan).

*Id.* at 3285 n. 14.

The Supreme Court's emphasis that a "pattern" requires continuity plus relationship has inspired some lower courts to accept the Court's obvious invitation to "develop a meaningful concept of pattern." A number of courts have read the continuity factor to require some separation or differentiation among the predicate racketeering acts. *See, e.g., Allington v. Carpenter,* 619 F.Supp. 474, 478 (C.D.Cal.1985) (pattern of racketeering activity must include racketeering activity sufficiently unconnected in time or substance to warrant consideration as separate criminal episodes); *Kredietbank, N.V. v. Joyce Morris, Inc.,* No. 84–1903 (D.N.J. Jan. 9, 1986) (two acts form a pattern only where "they are not only sufficiently connected, but also

sufficiently differentiated, to suggest a design or configuration.") Others have gone so far as to suggest that multiple fraudulent acts committed to implement a single fraudulent scheme can never constitute a "pattern". *See, e.g., Northern Trust Bank/O'Hare, N.A. v. Inryco, Inc.,* 615 F.Supp. 828, 833 (N.D.Ill.1985) (multiple fraudulent mailings implementing one fraudulent scheme do not comprise a pattern); *Fleet Mgmt. Systems v. Archer-Daniels-Midland Co.,* 627 F.Supp. 550 (C.D.Ill.1986) (scheme to market plaintiff's computer program illegally comprising at least eight fraudulent acts over a two year period did not constitute pattern). Other courts have rejected the idea that multiple fraudulent schemes are necessary. *E.g., Conan Properties, Inc. v. Mattel, Inc.,* 619 F.Supp. 1167, 1170 (S.D.N.Y.1985) (two acts arising out of same scheme adequately pled pattern of racketeering activity); *Trak Microcomputer Corp. v. Wearne Bros.,* 628 F.Supp. 1089 (N.D.Ill.1985) (pattern of racketeering activity can be established with respect to single fraudulent scheme).

This Court is loath to adopt a definition of pattern which turns on an assessment of whether one or multiple criminal schemes is involved. Such a definition would be highly susceptible to manipulative semantics. For example, an attempt by a racketeering enterprise to infiltrate General Motors could involve countless acts of mail fraud, extortion, securities fraud, and bribery. One could argue, however, that only one criminal scheme is involved because only one company was subverted. Under this view, a "pattern" would come into existence only after the same enterprise began to infiltrate Chrysler or Ford. On the other hand, the enterprise, in infiltrating General Motors, undoubtedly had committed criminal acts of a sufficient number and variety, over a sufficient period of time, to suggest the existence of an elaborate design. This should be enough to create a "pattern".

This Court will adopt the reasoning of cases such as *Kredietbank* and *Allington* that the "continuity" necessary for a pattern requires some separation as well as relatedness of the acts in question.

Where a single criminal act is repeated against a second victim, or repeated in a time and place removed from its first commission, the two acts arguably suggest a design or configuration, and may satisfy the pattern requirement. But the repetition of an act taken against a single victim or set of victims following closely on the heels of the original wrong, in some circumscribed circumstances, ... suggests no expansion, no ongoing design, no continuity, such as was the target of Congress in RICO. *Kredietbank, supra.* This continuity requirement sometimes may be met, however, where only one overall criminal scheme is involved.

■ Applying this discussion to the facts of the instant case, the Court finds that plaintiffs have not alleged a pattern of fraudulent activity. The only fraud alleged relates to defendants' January 1985 telephone calls and letters to the former Mullin clients in an effort to retain or solicit their business. Assuming that these communications fraudulently represented that BB&A was the lawful successor to the Mullin companies in order to usurp plaintiffs' commission income, the Court concludes that these acts were not sufficiently distinct in time or substance to comprise a pattern. These supposed misrepresentations occurred over a short period of time, were made to the same people, and took substantially the same form. Plaintiffs' failure to allege adequately all the elements of a § 1962(c) violation means that their RICO claims must be dismissed.

## IV. CONCLUSION

■ With the federal claims dismissed from the case, this Court faces a discretionary choice whether to retain pendent jurisdiction over the state law claims. This Court will not retain jurisdiction over this case. All the federal claims here have been dismissed, state law governs the essential dispute here over rights to customers and customer lists, and the parties al-

**542**

ready are lined up against one another in the Delaware Court of Chancery. *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726–27, 86 S.Ct. 1130, 1139–40, 16 L.Ed.2d 218 (1966). This case therefore is dismissed without prejudice. An Order will enter in accordance with this Opinion.[7]

---

**7.** Given the Court's resolution of defendants' motion to dismiss for failure to state a claim upon which relief can be granted, it need not reach defendant Ehlers' motion to dismiss for lack of personal jurisdiction and improper service of process. In case the personal jurisdic-tion issue is raised in the state court proceeding, the Court would direct the attention of the parties to *Calder v. Jones,* 465 U.S. 783, 790 (1984), and its possible effect on the "fiduciary shield" doctrine.