**John T. HILL, et al., Plaintiffs,**

v.

**EQUITABLE BANK, N.A., Defendant.**

**Civ. A. No. 82–220 CMW.**

United States District Court,
D. Delaware.

Aug. 29, 1986.

---

**1014**

See also 109 F.R.D. 109.

Steven D. Goldberg of Theisen, Lank, Mulford & Goldberg, Wilmington, Del. (Richard I. Kovelant and Douglas Clark Hollmann of Goldman, Kruger, Kovelant, Hurtt, Hollman & Kaiser, Laurel, Md., of counsel), for plaintiffs.

Martin I. Lubaroff of Richards, Layton & Finger, Wilmington, Del. (Michael D. Colglazier, Timothy L. Mullin, Jr. and Douglas B. Riley of Miles & Stockbridge, Baltimore, Md., of counsel), for defendant.

CALEB M. WRIGHT, Senior District Judge.

Defendant Equitable Bank, N.A., has moved to dismiss the four counts of plaintiffs' Second Amended Complaint alleging violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968. For the reasons set forth below, the Court will grant the motion in part and deny the motion in part.

## I. BACKGROUND

This litigation arises out of an alleged scheme to defraud plaintiffs in relation to the sale of interests in two limited partnerships, Wilmington House Associates ("Wilmington House") and Eagle Associates ("Eagle"). Although the Court previously has given extensive recitations of the underlying facts, *see, e.g.,* 562 F.Supp. 1324

(D.Del.1983), and 599 F.Supp. 1062 (D.Del. 1984), it must cover much of the same ground here to put the current motion in context.

On November 11, 1977, plaintiffs John T. Hill, Thomas and Patricia Ruger, Virgil and Marie Scott, and Descomp, Inc., a corporation controlled by Messrs. Ruger and Scott, entered into subscription agreements to purchase shares of Wilmington House, a limited partnership formed for the purpose of acquiring and operating an apartment complex. Lee P. Der orchestrated plaintiffs' purchase of the shares and served as general partner of Wilmington House through Lee P. Der, Inc., a company wholly owned by Der.

Plaintiffs paid for their shares by means of a down payment on November 11, 1977, and subsequent installment payments made on May 1, 1978, February 1, 1979, February 1, 1980, and February 1, 1981. The installment payments were financed through irrevocable letters of credit issued by Equitable on December 18, 1977. Equitable previously had sent applications for the letters of credit into Delaware. Approval of the letters of credit occurred through the recommendation of Equitable vice-president Stephen Meszaros, and possibly other bank employees, who allegedly received kickbacks from principals of Wilmington House.

On November 2, 1978, plaintiffs Thomas Ruger, Virgil and Marie Scott, and Data Controls North, Inc., a corporation controlled by Ruger and Scott, entered into subscription agreements to purchase shares of Eagle, a limited partnership engaged in the coal mining business in West Virginia. Plaintiff James T. Stritzinger entered into a similar subscription agreement on November 30, 1978. Lee P. Der also orchestrated plaintiffs' purchase of Eagle shares and served as general partner of Eagle through Der-Mas, Inc., a corporation Der controlled.

Eagle was formed as the resyndication of a predecessor limited partnership, Alma Coal Properties Ltd. ("Alma"). The resyndication of Alma into Eagle was part of an allegedly fraudulent scheme in which Equitable participated. In August 1978, Ward Development Co. ("Ward"), the sole limited partner of Alma, sued Der, the partnership, and others, claiming breaches of the partnership agreement. On August 31, 1978, Ward obtained a temporary injunction prohibiting Equitable from making payments on letters of credit issued to Ward to finance its purchases of Alma shares. This lawsuit and the possibility of Ward's withdrawal from Alma placed Alma on the brink of bankruptcy and created a substantial risk that Alma would default on Equitable's loans to the partnership. To stave off this possibility, Equitable and Der and other Alma principals in August, 1978, entered into a plan to conceal the lawsuit by foregoing collection of the balance due on Ward's partnership interest and to re-syndicate Alma as Eagle. Proceeds from the sales of new partnership interests would be used to retire part of Equitable's loans to Alma, and part of the debt eventually was paid off.

On November 6, 1978, Der set up a meeting in which Messrs. Ruger and Scott met with R. Kenneth Rous, an Equitable vice-president, to discuss, among other things, financing for plaintiffs' purchases of Eagle shares. At the meeting, Rous allegedly omitted to disclose material information about the partnership and made certain affirmative misrepresentations. These misrepresentations included statements that Eagle was a sound investment, that the Eagle private Placement Memorandum was accurate, and that Equitable had no conflicts of interest in the sale of Eagle shares.

James Stritzinger paid for his Eagle shares by means of a down payment on December 18, 1978, and subsequent installment payments on June 1, 1979, and June 1, 1980. Equitable provided a loan to finance Stritzinger's down payment and issued letters of credit to finance his installment payments.

Ruger, Virgil and Marie Scott, and Data Controls North, Inc., paid for their Eagle shares by means of a down payment on

December 15, 1978, and subsequent installment payments on June 1, 1979, and June 1, 1980. Equitable declined to issue letters of credit to finance their installment payments, and plaintiffs financed the installment payments by other means.

On July 16, 1979, the Securities and Exchange Commission ("SEC") issued an order finding that Der and Lee P. Der, Inc. had willfully violated several provisions of the securities laws in connection with their offers and sales of limited partnership interests. The order also suspended the broker-dealer registration of D & S Financial, Inc. ("D & S"), a broker-dealer controlled by Der which had handled plaintiffs' applications for loans and letters of credit to finance their purchases of Wilmington House and Eagle shares. Equitable learned of the SEC order on July 24, 1979, but failed to inform plaintiffs of its content.

On April 1, 1980, plaintiffs filed suit against Der, the partnerships, and others involved in the sale of partnership interests to plaintiffs, alleging they were fraudulently induced to purchase Wilmington House and Eagle shares through various misrepresentations. *Hill v. Der*, No. 80–146 (D.Del., filed April 1, 1980).

On February 20, 1981, Stritzinger wrote a letter to the Maryland State Banking Commissioner inquiring about possible improprieties regarding Equitable's relationship with Der and D & S, and Equitable's financing of Stritzinger's purchase of Eagle shares. The Commissioner forwarded this letter to Equitable with a request for an explanation. Hill wrote a letter to Equitable on March 9, 1981, inquiring about similar improprieties in connection with Equitable's financing of plaintiffs' purchases of Wilmington House shares and whether Equitable had terminated any employees as a result of such improprieties.[1] On March 17, 1981, Virgil Scott sent Equitable a similar letter.

On March 10, 1981, Equitable wrote a letter to the Bank Commissioner, denying any wrongdoing in connection with its financing of Stritzinger's purchase of Eagle shares, a copy of which the Commissioner forwarded to Stritzinger on March 17, 1981. Similarly, on April 17, 1981, Equitable wrote letters to Hill and Scott denying any improprieties in connection with its financing of plaintiffs' purchases of Wilmington House shares, copies of which were forwarded to the Bank Commissioner. The Bank Commissioner apparently took no further action on these matters.

At an April 15, 1982, meeting between plaintiffs and Equitable officials, the bank denied that it had done anything improper or illegal relating to its issuance of loans or letters of credit to plaintiffs.

Plaintiffs filed suit against Equitable on April 30, 1982. The Second Amended Complaint, filed January 2, 1986, alleges an assortment of claims under the federal securities laws and the common law of Maryland and Delaware. The particular federal claims alleged in relation to the Wilmington House deal include substantive violations of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 stemming from various omissions of material facts by the Bank, aiding and abetting violations of those provisions, conspiracy to violate those provisions, and aiding and abetting violations of § 12(2) of the Securities Act of 1933. The federal claims relating to Eagle include various affirmative misrepresentations and omissions of material fact in violation of § 10(b) and Rule 10b–5, aiding and abetting violations of 10b–5, conspiracy to violate 10b–5, aiding and abetting violations of § 12(2), and "controlling person" liability under § 20 of the Exchange Act and § 15 of the Securities Act. In addition, plaintiffs allege a substantive violation of RICO (§ 1962(c)) and a conspiracy to violate RICO (§ 1962(d)) for each partnership deal, which are the subject of the current motion to dismiss.

---

**1.** In February 1981, plaintiffs apparently learned that an Equitable employee involved in arranging letters of credit for plaintiffs' purchases of Wilmington House shares had left the bank in mid–1978.

## II. DISCUSSION

Plaintiffs have alleged violations of the following provisions of RICO:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

18 U.S.C. § 1962(c), (d). Liability under § 1962(c) requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.*, — U.S. ——, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). In relation to both the Wilmington House and Eagle RICO counts, Equitable is the "person". The "enterprise" involved in the Wilmington House RICO counts is either the Wilmington House limited partnership or, alternatively, Equitable and all or part of a group identified as the Wilmington House defendants.[2] Equitable's "racketeering acts" making up the "pattern" in relation to Wilmington House include mailing of applications for letters of credit and loans to plaintiffs, issuing such loans and letters of credit to Wilmington House investors, and omitting to disclose material information, both at the November 6, 1978, meeting with Equitable vice-president Rous and subsequently.[3]

The "enterprise" involved in the Eagle RICO counts is either the Eagle limited partnership or, alternatively, Equitable and all or part of a group identified as the Eagle defendants.[4] Equitable's "racketeer-ing acts" constituting the "pattern" in relation to Eagle include making affirmative misrepresentations and omitting to disclose material information at the November 6, 1978, meeting; omitting to disclose material information acquired subsequently; and participating in the Alma "bail-out" scheme by settling the Ward lawsuit and resyndicating Alma as Eagle.

Defendant raises a multitude of arguments why the RICO counts should be dismissed, some of which pertain to all four counts, some of which pertain only to the § 1962(c) counts, and some of which pertain only to the § 1962(d) counts.

### A. "Person", "Enterprise" or Both

Equitable argues in relation to all four RICO counts that plaintiffs have blurred the distinction between "person" and "enterprise", such that the Complaint neither provides Equitable with sufficient notice about the theories advanced against it nor makes clear that each theory states a cause of action. The case on which Equitable relies in support of its argument, *Kredietbank N.V. v. Joyce Morris, Inc.*, No. 84–1903 (D.N.J. Jan. 9, 1986) [Available on WESTLAW, DCTU database], (available on LEXIS, Genfed Library, Dist. File), is clearly distinguishable, however. The RICO count in *Kredietbank* listed three entities as "persons" and then alleged "enterprises" consisting of the same three entities, individually and in combination. Claims phrased in such a manner made it unclear whether the identical entity was alleged as both the "person" and the "enterprise", in contravention of the Third Circuit's holding in *B.F. Hirsch v. Enright Refining Co.*, 751 F.2d 628, 633–34 (3d Cir.1984) (under RICO, "person" cannot be same entity as "enterprise").

---

**2.** This group includes Lee P. Der, Lee P. Der, Inc., D & S Financial, Inc., Wilmington House, Lancaster Court Associates, Lancaster Associates, Inc., Stuart Bittelman, Marvin E. Greenfield, and David E. Karr. .

**3.** Plaintiffs allege that Rous' representations about the soundness of Eagle constituted an implicit assurance that Wilmington House also was a sound investment, because the same principals were involved in each partnership.

**4.** This includes Der, Lee P. Der, Inc., D & S Financial, Inc., Der-Mas, Inc., Eagle, Alma, Martin E. Mason, and Roger W. Ball.

In contrast, in the instant case, Equitable is the only "person" alleged. The "enterprise" is alternatively pled as either the limited partnership (Wilmington House or Eagle) or Equitable *plus* any or all of a listed group of entities. There is no possibility that Equitable alone is both the "person" and the "enterprise". The Court finds that the allegations are sufficient to put Equitable on notice of the theories advanced against it and to establish that proper RICO claims are alleged in relation to both Wilmington House and Eagle.[5]

### B. Pattern of Racketeering Activity

Equitable makes two arguments why the substantive RICO counts under § 1962(c) should be dismissed: (1) although the enterprise committed racketeering acts, Equitable's acts relating to the enterprise were not racketeering acts; and (2) assuming Equitable did commit racketeering acts, these acts did not constitute a "pattern of racketeering activity."

In relation to defendant's first argument, the Court notes that § 1962(c), on its face, requires only that the defendant "participate, directly or indirectly", in the conduct of the enterprise's affairs. Numerous courts have held that indirect or peripheral involvement in the affairs of the enterprise, such as that alleged against Equitable, is sufficient to establish a claim under RICO. *See, e.g., Bank of America v. Touche Ross & Co.*, 782 F.2d 966, 970 (11th Cir.1986); *United States v. Forsythe*, 560 F.2d 1127, 1136 (3d Cir.1977).[6]

■ Equitable's argument also may be interpreted as asserting that, as a matter of law, the acts it committed were not racketeering acts. Whether the activities in which Equitable engaged—such as issu-ing letters of credit or participating in a sales meeting—are racketeering or innocent acts depends on the context in which they were committed. Such questions of fact may not be addressed on a motion to dismiss. *See Bank of America*, 782 F.2d at 970.

Equitable argues next that, assuming it committed racketeering acts, those acts do not form a "pattern" of racketeering activity. The RICO statute defines "pattern of racketeering activity" as requiring at least two acts of racketeering activity committed within ten years of each other. In light of dicta in the U.S. Supreme Court decision in *Sedima, S.P.R.L. v. Imrex Co.*, — U.S. ——, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985), numerous courts, including this one, have held that a "pattern" exists only where the predicate racketeering acts are related to each other and suggest continuous, rather than isolated, wrongdoing. *See, e.g., Paul S. Mullin & Associates, Inc. v. Bassett*, 632 F.Supp. 532, 541 (D.Del. 1986); *Allington v. Carpenter*, 619 F.Supp. 474, 478 (C.D.Cal.1985); *Krediet-bank, N.V. v. Joyce Morris, Inc.*, No. 84–1903 (D.N.J. Jan. 9, 1986) (available on LEXIS, Genfed Library, Dist. File).

■ A current subject of debate in this area is whether the "continuity" aspect of a "pattern" requires that the racketeering acts occur in several criminal schemes, rather than a single scheme. *Compare, e.g., Fleet Mgmt. Systems, Inc. v. Archer-Daniels-Midland Co.*, 627 F.Supp. 550 (C.D.Ill.1986) (multiple schemes required); *Medallion TV Enterprises, Inc. v. SelecTV of California*, 627 F.Supp. 1290 (C.D.Cal. 1986) (same); *with Trak Microcomputer Corp. v. Wearne Bros.*, 628 F.Supp. 1089

---

5. Equitable apparently makes the argument, albeit in an offhand manner, that it is not liable under RICO because the facts alleged show only that it conducted its *own* affairs, not the affairs of the enterprise. *See* Letter from Defendant to Court at 6 (June 18, 1986), Docket No. 178. A person conducts the activities of an enterprise through a pattern of racketeering when "the predicate offenses are related to the activities of that enterprise," *United States v. Provenzano*, 688 F.2d 194, 200 (3d Cir.), *cert. denied*, 459 U.S.

1071, 103 S.Ct. 492, 74 L.Ed.2d 634 (1982). The acts allegedly committed by Equitable obviously were related to the activities of the enterprise, so a sufficient nexus exists to allow a RICO claim.

6. Indeed, plaintiffs' allegations, if true, suggest that Equitable may have participated directly in the affairs of the enterprise involved in the Eagle deal.

(N.D.Ill.1985) (pattern can exist in relation to one criminal scheme); *Bank of America v. Touche Ross & Co.*, 782 F.2d 966 (11th Cir.1986) (same). In *Mullin*, this Court adopted a flexible approach to the "pattern" concept, finding that "criminal acts of a sufficient number and variety, [committed] over a sufficient period of time,.... should be enough to create a 'pattern'," even where only one overall criminal scheme is involved. 632 F.Supp. at 541. Other courts also have adopted such a flexible approach. *See, e.g., Graham v. Slaughter*, 624 F.Supp. 222 (N.D.Ill.1985); *Temporaries, Inc. v. Maryland Nat'l. Bank*, 638 F.Supp. 118 (D.Md.1986). Equitable therefore cannot argue successfully that a "pattern" does not exist merely because only one criminal scheme (the fraudulent offer and sale of securities) existed in relation to each limited partnership.

█ The Court instead must assess the activities comprising each alleged "pattern" to determine if they show sufficient continuity to satisfy the statute.[7] Plaintiffs rely on the following acts to establish a pattern in relation to the Wilmington House deal: Equitable's mailing of applications for letters of credit to plaintiffs and issuance of such letters of credit in December 1977, which aided and abetted the fraud; the omissions of material facts which occurred at the November 6, 1978, meeting conducted by an Equitable officer; and Equitable's subsequent failure to disclose material information—in particular, the SEC order issued against Der in July 1979. The Court finds that these acts were of a sufficient number and variety and occurred over a sufficient period of time to constitute a "pattern".

Plaintiffs rely on the following acts to establish a "pattern" in relation to the Eagle deal: Equitable's participation in the illegal conspiracy to bail out Alma by settling the Ward lawsuit and resyndicating Alma as Eagle; the material misrepresentations and omissions of material facts

which occurred at the November 6, 1978, meeting conducted by an Equitable officer; and Equitable's subsequent failure to disclose material information about the July 1979 SEC order, among other things. The Court finds that these acts also were sufficiently numerous, different, and separated in time to comprise a "pattern".

One other factor counsels in favor of finding that each scheme had a sufficient imprimatur of continuity and open-endedness to constitute a pattern. Equitable allegedly has attempted to cover up its role in any illegal activity by denying to plaintiffs and the Maryland Bank Commissioner that it has done anything wrong in relation to either partnership. Such a cover-up, if true, would show that Equitable's wrongdoing has continued long after plaintiffs purchased their partnership shares.

In summary, plaintiffs adequately have alleged that Equitable engaged in a "pattern of racketeering activity" in relation to both Wilmington House and Eagle to state claims under § 1962(c).

### C. Conspiracy to Violate RICO

Equitable also makes two arguments why the two RICO conspiracy counts should be dismissed: (1) plaintiffs fail to alleged that Equitable agreed with anyone to do anything in furtherance of the conspiracy to violate RICO; and (2) plaintiffs allege only a conspiracy to commit the predicate acts, not a conspiracy to violate RICO.

In arguing that a valid claim under § 1962(d) requires an allegation that the defendant agreed to commit two or more predicate acts, Equitable relies on two circuit court decisions, *United States v. Ruggiero*, 726 F.2d 913, 921 (2d Cir.), *cert. denied, Rabito v. U.S.*, 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984); and *United States v. Elliott*, 571 F.2d 880, 902–03 (5th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). These decisions are simply beside the point for this Court, how-

---

**7.** Regarding each limited partnership, the activities comprising the "pattern" obviously are related to each other. The Court thus need consider only the continuity of the alleged predicate acts.

ever, because the Third Circuit has ruled that a defendant need not agree to commit personally two or more predicate acts. *See United States v. Adams*, 759 F.2d 1099, 1116 (3d Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 336, 88 L.Ed.2d 321 (1985).

Regarding Equitable's second argument, relevant Third Circuit decisions make clear that a RICO conspiracy is something different from an agreement merely to commit the predicate offenses. *See Seville Industrial Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 792 n. 8 (3d Cir.1984) (§ 1962(d) prohibits conspiracies knowingly to further affairs of the enterprise), *cert. denied*, —— U.S. ——, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985); *United States v. Riccobene*, 709 F.2d 214, 224 (3d Cir.) (RICO prohibits agreement to conduct activities of enterprise through commission of predicate offenses), *cert. denied*, 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983).

Weighing plaintiffs' RICO conspiracy allegations against the Third Circuit standard, the Court finds that the Eagle conspiracy allegation measures up, while the Wilmington House conspiracy allegation does not. Paragraph 176 of the Second Amended Complaint, relating to Eagle, states:

Equitable's schemes, conspiracies and other unlawful activities and conduct ... constitute a conspiracy with the Eagle defendants to violate 18 U.S.C. § 1962(c) in the fraudulent offer and sale of securities.... In furtherance of this combination and conspiracy, Equitable and its co-conspirators maliciously did those things which they combined and conspired to do, including [the acts constituting the pattern of racketeering activity].

This allegation, through its reference to § 1962(c), gives Equitable adequate notice of plaintiffs' claim that it conspired to conduct the activities of the enterprise through the listed racketeering acts.

In contrast, the analogous paragraph in the Wilmington House count states:

Equitable, by virtue of its financial relationship with the Wilmington House de-

fendants and with Wilmington House Associates Limited Partnership, ... as well as [ ... other racketeering acts], conspired with the Wilmington House defendants and others to participate directly and indirectly in the fraudulent offer and sale of securities of Wilmington House Associates to the plaintiffs and others.

Second Amended Complaint ¶ 190. This allegation gives Equitable notice only of its participation in a conspiracy to sell securities fraudulently and does not pass muster under *Seville* and *Riccobene*. Accordingly, the Wilmington House RICO conspiracy count must be dismissed.

## III. CONCLUSION

For all the foregoing reasons, Defendant's Motion to Dismiss Counts 21, 22, and 23 of the Second Amended Complaint is denied. Defendant's Motion to Dismiss Count 24 is granted. An Order will enter in conformity with this Opinion.