**SATELLITE FINANCIAL PLANNING CORPORATION, et al., Plaintiffs,**

v.

**FIRST NATIONAL BANK OF WILMINGTON, et al., Defendants.**

**Civ. A. 85–463 CMW.**

United States District Court, D. Delaware.

April 9, 1986.

James F. Harker of Herlihy & Wier, Wilmington, Del. of counsel: Robert W. Steele, P.C., Roger C. Simmons, James R. Myers, and W. James McKay of Steele, Simmons & Fornaciari, Washington, D.C., William F. Jones of Jones & Manck, P.A., Annapolis, Md., and Edward J. Glusing, Jr. of Baltimore, Md., for plaintiffs.

Walter L. Pepperman, II, William H. Sudell, Jr., and David A. Jenkins of Morris Nichols, Arsht & Tunnell, Wilmington, Del., for defendant First Nat. Bank of Wilmington.

E. Norman Veasey of Richards, Layton & Finger, Wilmington, Del., of counsel: James R. Eyler, Jefferson V. Wright, and J. Steven Lovejoy of Miles and Stockbridge, Baltimore, Md., for defendants Commercial Credit Corp. and Control Data Corp.

CALEB M. WRIGHT, Senior District Judge.

Plaintiffs Satellite Financial Planning Corp. (hereinafter Satellite Financial) and Satellite Earth Station Protection Co., Inc. (hereinafter Earth Station) commenced this action in the United States District Court

for the District of Maryland by filing a 35-page, ten-count complaint against the First National Bank of Wilmington (hereinafter First National Bank), Commercial Credit Company and Control Data Corporation. All three defendants have filed motions to dismiss, which are the subject of this opinion.

The complaint alleges claims against all three defendants as follows: (a) Bank Holding Company Act violations, (b) antitrust violations, (c) breach of contract, (d) breach of implied contract, (e) breach of fiduciary relationship, (f) tortious interference with business relationships, (g) fraud, (h) RICO violations, (i) trade defamation, and (j) violation of financial privacy.

Defendants Commercial Credit and Control Data moved to dismiss all but count one (violations of the Bank Holding Company Act, 12 U.S.C. §§ 1841–1849 (1982)).[1] Defendant First National Bank moved to dismiss all but counts one (Bank Holding Company Act violations), three (breach of contract) and four (breach of implied contract). Defendants subsequently moved for and obtained a transfer of the action to this district. At this Court's direction, the parties on October 29, 1985, simultaneously filed briefs dealing with the motions to dismiss.[2]

## I. Factual Background

Satellite Financial and Earth Station are Maryland corporations with the same principal place of business in Columbia, Maryland. Complaint ¶¶ 2, 3. Satellite Financial arranged financing for purchases of satellite dish television signal receiving system by individuals, and acted as an agent for Earth Station, which sold warranties and service contracts for satellite equipment. Complaint ¶¶ 9, 10.

First National Bank is a Delaware banking institution with principal offices in Wilmington, Delaware. Complaint ¶ 4. Commercial Credit is a Delaware corporation with principal offices in Baltimore, Maryland. It makes commercial and consumer loans through more than one hundred wholly-owned subsidiary loan offices located in the 48 contiguous states. Commercial Credit controls each of these wholly owned subsidiaries. Complaint ¶¶ 6, 7. Commercial Credit owns more than 99 percent of the stock of First National Bank, Affidavit of A.F. Ortwein, Jr. ¶ 5 (filed in connection with First National Bank's motion to transfer)[3] and controls the bank's business operations. Complaint ¶¶ 11, 12; see CC/CD Br. at 26.

Control Data is a Delaware corporation with principal offices in Minneapolis, Minnesota. It wholly owns Commercial Credit, and regularly directs and supervises the financial activities of Commercial Credit and the banking activities of First National Bank. Complaint ¶ 13; see CC/CD Br. at 13.

The Federal Communications Commission licenses satellite dish receiving sys-

---

1. By letter to dated January 27, 1986, counsel for Commercial Credit and Control Data informed the Court that, in light of the Supreme Court decision in *Board of Governors of the Federal Reserve System v. Dimension Financial Corp.*, —— U.S. ——, 106 S.Ct. 681, 88 L.Ed.2d 691 (1986) (interpreting the Bank Holding Company Act), Commercial Credit and Control Data would move to dismiss count one, if plaintiffs did not withdraw it voluntarily.

2. The Court will refer to the October 29th brief of Commercial Credit and Control Data in support of their motion to dismiss as "CC/CD Br.", First National Bank's brief as "FNB Br." and plaintiffs' consolidated brief in opposition to the motions to dismiss as "Pl.Br.".

3. Because this is a motion to dismiss for failure to state a claim upon which relief can be granted, the Court must accept all well-pleaded facts in the complaint as true and make all reasonable inferences in plaintiffs' favor. *D.P. Enterprises, Inc. v. Bucks County Community College*, 725 F.2d 943 (3d Cir.1984). Defendants refer the Court to a factual affidavit to supplement the briefs on their dismissal motions. Reliance on such matters outside the pleadings transforms the motion to dismiss into a motion for summary judgment. *See* Fed.R.Civ.P. 12(b); *Carter v. Stanton*, 405 U.S. 669, 92 S.Ct. 1232, 31 L.Ed.2d 569 (1972). To the extent the Court considered information outside the complaint in making its findings on the legal sufficiency of plaintiffs' claims, defendants' motions, as they pertain to those claims, will be treated as if for summary judgment. *See JM Mechanical Corp. v. United States*, 716 F.2d 190, 197 (3d Cir.1983).

tems capable of television reception only (TVRO's). Complaint ¶ 15. During the infancy of the TVRO industry in late 1982 and early 1983, TVRO systems typically were sold by small retail dealers in remote areas with poor television reception and few channels. Most dealers had limited repair or support facilities for the TVRO systems they sold. Complaint ¶ 17.

No established source of financing for TVRO purchases existed at the time, nor did anyone offer warranties and service contracts for all makes of TVRO systems. Mr. William H. Young, Jr., a Maryland insurance agent, formed Satellite Financial and Earth Station to meet these perceived needs. Earth Station was to sell warranties and service contracts for TVRO systems. Satellite Financial was to provide TVRO dealers with a quick and easy way for consumers to finance purchases of TVRO systems and Earth Station warranties. Complaint ¶¶ 16, 18.

Plaintiffs recruited approximately 3,000 retail TVRO dealers who agreed to offer financing through Satellite Financial and to sell Earth Station warranties. They contacted several financial institutions, including First National Bank and Commercial Credit, to obtain necessary funding. Complaint ¶ 23. Representatives of Commercial Credit and First National Bank met with Mr. Young numerous times in Maryland during the spring and summer of 1983. Employees of Commercial Credit and First National Bank assured Mr. Young that neither Commercial Credit nor the bank would compete with his venture. Complaint ¶ 25. Satellite Financial (Delaware), a Delaware corporation, entered into two agreements with First National Bank on September 1, 1983.[4] Complaint ¶ 24.

The first agreement, the "Operating Agreement", provided that Satellite Financial would offer credit applications of prospective TVRO purchasers to First National Bank on forms provided by the bank. O.A. ¶¶ 1, 9.[5] The agreement did not require the bank to approve any applications. The bank agreed to notify Satellite Financial of its acceptance or rejection of most applications within one business day. O.A. ¶ 1. The agreement contemplated that borrowers would use unsecured loan proceeds to purchase TVRO equipment and Earth Station warranties. O.A. ¶¶ 1, 2(b)-(c).

The agreement called for Satellite Financial to submit credit applications only to First National Bank, except when the bank had rejected the prospective borrower, or the borrower had rejected the financing terms offered by the bank. The bank agreed that neither it nor any of its "affiliates" (a term which encompassed Commercial Credit and Control Data) would enter into another brokerage agreement that dealt with financing satellite dish receiving systems. O.A. ¶ 1.

First National Bank agreed to pay Satellite Financial a "processing fee" of $250 each time it disbursed loan proceeds to borrowers whose credit applications Satellite Financial had submitted. O.A. ¶ 2(a). The agreement restricted First National Bank from certain activities, including: (i) soliciting borrowers, or aiding any other person or company in soliciting borrowers, for the purpose of selling TVRO equipment, warranties or insurance; (ii) transferring to anyone a list of names of borrowers or dealers who came to the bank's attention through Satellite Financial; and (iii) contacting any TVRO dealer who had transmitted credit information to the bank via Satellite Financial, for the purpose of having the TVRO dealer provide credit information directly to the bank in the future without Satellite Financial's involvement. The bank and its affiliates could, however, solicit and sell credit life, credit disability

---

**4.** Satellite Financial (Delaware), also formed by Mr. Young, later assigned all its rights under these agreements to plaintiff Satellite Financial Planning Corporation. The Court will refer to both companies simply as "Satellite Financial."

**5.** The Court will refer to the Operating Agreement, which is appended to the complaint as Attachment A, as "O.A." followed by the relevant paragraph reference.

or credit accident and health insurance to any borrower. O.A. ¶ 6(a).

The Operating Agreement provided that Satellite Financial, as an independent contractor, would not be responsible for any acts of the bank or its affiliates, or of any of their officers, agents or employees. O.A. ¶ 7. Either party could terminate the agreement by giving 180 days written notice of its intention to do so. O.A. ¶ 8. The agreement required that it be construed under Delaware law. O.A. ¶ 10.

Under the second agreement, the letter agreement, First National Bank agreed to pay Satellite Financial a royalty fee of one percent of any subsequent loans made to borrowers whose credit applications had come to it via Satellite Financial.[6]

First National Bank subsequently participated in promotional activities with plaintiffs. The parties stated for publication that the bank anticipated making loans of $750 million for TVRO purchases through Satellite Financial's program.[7] A photograph that purported to show Mr. Young and Joseph Gammon, then president of First National Bank, shaking hands on the deal appeared on the cover of the November 1983 issue of a TVRO trade magazine.

Some TVRO purchasers utilized Satellite Financial's credit program in late 1983 and 1984. About half of these borrowers also purchased warranty and service contracts from Earth Station. Earth Station made approximately $250 profit on each sale. Complaint ¶ 30.

The complaint alleges, on information and belief, that employees of First National Bank began in 1983 to reveal regularly to Commercial Credit and Control Data the identity of TVRO purchasers and dealers who came to it via Satellite Financial. Complaint ¶ 31. Commercial Credit and Control Data allegedly used this information to put into operation a plan, conceived at the beginning of negotiations with Satellite Financial, to drive Satellite Financial and Earth Station out of business. The plan included establishment of a competing program, administered through Commercial Credit, which would "pirate" borrowers from Satellite Financial. To further the plan, First National Bank allegedly rejected creditworthy borrowers who came to it via Satellite Financial and failed to disburse loan proceeds promptly to those who it did approve. The bank purportedly did not pay Satellite Financial in a timely manner fees for subsequent loans, as provided in the letter agreement. It also restricted borrowers' credit lines to avoid having to pay Satellite Financial these fees. The complaint also alleges that the bank "coerced" Earth Station into agreeing to limit the price it charged for its warranties to $525. Complaint ¶ 32.

The bank notified plaintiffs in 1984 of its intention to terminate the Operating Agreement. Complaint ¶ 32. Satellite Financial and Earth Station subsequently ceased operating.

Plaintiffs claim that these facts reveal a malicious and intentional effort designed to drive them out of business, while concomitantly destroying the good names of Satellite Financial, Earth Station and William Young, so that Commercial Credit and Control Data could finance TVRO purchases themselves without competition. Plaintiffs seek $3 billion in damages ($300 million for each of ten counts).

## II. Choice of Law Issues

The transfer of this case under 28 U.S.C. § 1404(a) (1982) from the District of Maryland, and thus from the jurisdiction of the Court of Appeals for the Fourth Circuit to that of the Third Circuit, raises parallel choice of law issues. The complaint contains federal statutory claims as well as pendant state contract, tort and fiduciary

---

6. The subsequent loans covered by the second agreement, which is appended to the complaint as Attachment B, did not include the TVRO loans contemplated by the Operating Agreement or purchases from merchants made with credit cards issued by the bank.

7. This amount was based on an estimated 300,000 units financed through the program over a two-year period. Complaint ¶ 28.

relationship claims. State choice of law rules will determine which state substantive law applies. The Court also must decide whether Fourth Circuit or Third Circuit precedent, to the extent they differ, governs this case.

### A. *State-law Claims*

■ Forum choice of law rules apply to resolve conflict of law questions for state claims in federal courts. *See System Operations v. Scientific Games Devel. Corp.*, 555 F.2d 1131, 1136 (3d Cir.1977); *Bilancia v. General Motors Corp.*, 538 F.2d 621, 623 (4th Cir.1976). When a defendant transfers a case from one federal forum to another, "the transferee district court must apply the state law that would have been applied if there had been no change of venue." *Van Dusen v. Barrack*, 376 U.S. 612, 639, 84 S.Ct. 805, 821, 11 L.Ed.2d 945 (1964). Maryland choice-of-law rules thus will determine the substantive law that governs plaintiffs' state-law claims.

■ The Operating Agreement forms the basis of plaintiffs' contract and fiduciary relationship claims. The agreement contains a choice-of-law provision that provides for its construction under Delaware law. Maryland recognizes the validity of contractual choice of law provisions as long as there is some relationship between the agreement and the contractually chosen state, and the laws of that state do not contravene a fundamental policy of Maryland. *Kronovet v. Lipchin*, 288 Md. 30, 415 A.2d 1096, 1105 (1980); *see also Kirby v. Chrysler Corp.*, 554 F. Supp. 743, 748 (D.Md.1982).

■ Only Delaware corporations executed the Operating Agreement, which called for First National Bank to perform its obligations in Delaware. No known applicable Delaware law contravenes fundamental Maryland policies. Delaware substantive law thus will govern plaintiffs' contract claims and fiduciary duty claims

that arise from the parties' contractual relationship. *Cf.* W. Keeton, *Prosser & Keeton on Torts*, § 92 at 657 (5th ed. 1984).

■ Maryland follows the *lex loci delicti* rule to determine applicable tort law. *Hauch v. Connor*, 295 Md. 120, 453 A.2d 1207, 1209 (1983). This rule requires application of the substantive law of the place where the wrong occurred. *Id.* at 1210. All alleged torts occurred in Maryland, so Maryland substantive law governs plaintiffs' tort claims.

### B. *Federal-law claims*

The removal of the case from the District of Maryland, which is within the jurisdiction of the U.S. Court of Appeals for the Fourth Circuit, to this district, which is within the jurisdiction of the Court of Appeals for the Third Circuit, raises a similar conflict-of-laws issue concerning plaintiffs' federal claims. Different interpretations of federal statutes might result in different outcomes in this case depending upon which circuit court's precedent controls.

The Supreme Court commanded in *Van Dusen* that a transferee district court apply transferor forum law. However, *Van Dusen* dealt only with variations from "state laws of the transferor State which would significantly affect the outcome of [a] case." 376 U.S. at 639, n. 40, 84 S.Ct. at 821, n. 40.[8] *Van Dusen* mandates that transfer under § 1404(a) not change the governing *substantive* law that significantly affects the outcome of a case. It did not address a situation like the present, where a transfer from one federal circuit to another presents a change in controlling interpretations of the same substantive law.

■ *Van Dusen* does not apply here. The federal statutes that provide the substantive law in this case apply nationwide, and their interpretations by the United States Court of Appeals for the Third Circuit and prior decisions of this Court will govern this case. The Court chooses not to face the possibility of having to disregard

---

8. "A change of venue under § 1404(a) generally should be, *with respect to state law*, but a change of courtroom." *Van Dusen,* 376 U.S. at 639, 84 S.Ct. at 821 (emphasis added).

the established law of this District, or the anomaly of the Court of Appeals for the Third Circuit having to disagree with its own precedent on appeal because it differs from that of the District of Maryland and the Fourth Circuit. Like procedural advantages that a defendant might gain from removal under 28 U.S.C. § 1441(a),[9] any tactical advantage that accrues to defendants as a result of this decision differs little from that which plaintiffs might have realized had they remained in their original forum.

## III. Antitrust Claims

Plaintiffs' antitrust claims arise from an alleged "web of anti-competitive conduct" spun by defendants in the "market for financing TVRO equipment." Pl. Br. at 12. The complaint alleges that defendants engaged in price-fixing, tying arrangements, exclusive dealing arrangements, monopolization and attempted monopolization, with the intent to restrain trade, pirate plaintiffs' business and monopolize the market for financing TVRO systems and related services.

Defendants contend that the facts alleged in the complaint fail to set forth the minimum elements of the antitrust theories plaintiffs advance. Plaintiffs counter that their antitrust theory cannot be dissected, and ask that the Court not sort out their complex claims in ruling on defendants' motion to dismiss.

Congress designed the antitrust laws to control the exercise of private economic power by preventing monopolies and protecting competition. See Standard Oil Co. v. FTC, 340 U.S. 231, 249, 71 S.Ct. 240, 249 (1951). Antitrust laws restrict anticompetitive conduct in order to advance consumer welfare. See generally R. Bork, The Antitrust Paradox (1978). They are not meant to redress personal wrongs that do not impact on competition or adversely affect consumers. The primary purpose of the antitrust statutes, to benefit consumers

through competition, must guide the Court in deciding antitrust issues before it.

Pleading requirements for antitrust claims are not as stringent as those for other types of claims, see Poller v. Columbia Broadcasting System, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), and "dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." Hospital Building Co. v. Trustees of Rex Hospital, 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976). A party claiming an antitrust violation, however, must allege sufficient facts to state each element of an antitrust offense. C.R. Bard, Inc. v. Medical Electronics Corp., 529 F.Supp. 1382, 1389 (D.Mass.1982). "Conclusory allegations that defendant violated the antitrust laws and plaintiff was injured thereby will not survive a motion to dismiss if not supported by facts constituting a legitimate claim for relief." Quality Foods v. Latin Am. Agribusiness Dev. Corp., 711 F.2d 989, 995 (11th Cir.1983).

The Court must assume that plaintiffs can prove the facts alleged in their complaint. It cannot, however, assume that plaintiffs can prove facts that they have not alleged, or that defendants have violated the antitrust laws in ways that have not been alleged. Associated General Contractors v. Calif. State Council of Carpenters, 459 U.S. 519, 526, 103 S.Ct. 897, 902, 74 L.Ed.2d 723 (1983). To survive a motion to dismiss, the factual circumstances alleged in the complaint must describe activities that constitute anticompetitive conduct under the various sections of the antitrust statutes.

The Court finds it necessary to examine separately the activities alleged in the complaint, together with the particular antitrust theories plaintiffs advance, to determine which, if any, of the various sections of the antitrust statutes defendants violated. As the following will indicate, the Court's examination reveals that plaintiffs

9. In deciding state-law claims, federal courts apply the Federal Rules of Civil Procedure even if they differ from state procedural rules and give a defendant a tactical advantage. See Hanna v. Plumer, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965).

have not stated antitrust claims upon which relief can be granted.

## A. *Price Fixing Claims*

Plaintiffs allege that defendants engaged in illegal price fixing by coercing Earth Station to set a $525 maximum warranty price. They claim that this "naked price fixing" violated Section 1 of the Sherman Act. Plaintiffs contend the following: Defendants competed with Satellite Financial in the "market for TVRO financing." They knew of plaintiffs' integrated operations and that the failure of Earth Station would cause the demise of Satellite Financial. Defendants thus targeted Earth Station for "anticompetitive price-fixing activities," and required it to sell its product at an unprofitable price so that both Earth Station and Satellite Financial would fail. With no remaining competition, defendants could monopolize the market.

Defendants note that price fixing is either "horizontal," that is, an agreement between competitors to fix prices, or "vertical," which arises when a producer fixes a product's resale price. They claim that no horizontal price fixing can occur without an agreement between *competitors* to fix prices. They reason that because none of them ever sold TVRO warranties, none of them ever competed with Earth Station, and deduce that they could not have fixed prices horizontally.

Defendants similarly contend that they could not have engaged in vertical price fixing, also known as "resale price maintenance." Because no defendant sold warranties, none could fix their resale price, so no vertical price fixing could take place. They conclude that since the alleged maximum-warranty-price setting could not have constituted either a horizontal or vertical restraint, no price fixing in violation of Section 1 could have occurred.

■ The Court finds that defendants did not fix prices in violation of Section 1.

Illegal price fixing is either horizontal or vertical. No one can do it alone. Section 1 of the Sherman Act requires a "contract, combination ... or conspiracy in restraint of trade or commerce." 15 U.S.C. § 1 (1982). A parent corporation and its wholly owned subsidiaries share a common purpose and cannot, as a matter of law, conspire with each other in violation of Section 1. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984).

■ Control Data wholly owns Commercial Credit, so no illegal conspiracy can exist between them. Commercial Credit in turn owns more than 99 percent of the stock of First National Bank.[10] Commercial Credit does not technically "wholly own" the bank, but the *de minimus* difference between its percentage of ownership and 100 percent ownership does not diminish *Copperweld's* applicability. The extent to which Commercial Credit, and thus Control Data, own the bank engenders the inherent "unity of purpose" and "common design" that makes it impossible for them to conspire together in a Sherman Act context. 467 U.S. at 771, 104 S.Ct. at 2742, 81 L.Ed.2d at 643–44. The Court accordingly finds, as a matter of law, that defendants could not have contracted, combined or conspired with each other in violation of Section 1. The complaint alleges no other party who engaged in price-fixing activities. It therefore fails to state a claim of horizontal price fixing.

■ Defendants' activities thus either must have constituted vertical price fixing or not have violated Section 1 at all. The Court agrees with defendants that defendants could not illegally have fixed Earth Station's warranty resale price because they never sold any warranties to anyone. As a result no illegal vertical price fixing occurred.

10. Complaint ¶¶ 11, 12 and 13; Affidavit of J.F. Ortwein Jr., President of First National Bank; CC/CD Br. at 26. Under Fed.R.Civ.P. 12(b)(6), defendants' reliance on matters outside the pleadings triggers Rule 56 summary judgment standards for this portion of their motions. *See* note 3.

■ Even if the restraint did constitute vertical price fixing, however, its *de minimus* effect on competition keeps it from having violated Section 1. Vertical price fixing is not a *per se* antitrust violation.[11] It is judged under the rule of reason, *see Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), which requires an adverse effect on competition. In this case, the short-term nature of the restraint precluded it from having any significant adverse impact on consumers.

■ The ultimate essence of the relationship between plaintiffs and defendants is contractual. Their association stems from the Operating Agreement. The Operating Agreement effectively provided for the termination of their relationship upon either the bank or Satellite Financial giving the other 180 days written notice. O.A. ¶ 8. Plaintiffs could have eliminated any restraint upon Earth Station's pricing structure by terminating the agreement. Earth Station subsequently could have offered future warranties for sale at whatever price it wanted.

Defendants could not have coerced Earth Station into maintaining for longer than 180 days an artificially low and unprofitable price for its warranties.[12] Defendants' alleged coercion during the relatively short 180-day time period could cause only a *de minimus* effect on competition, and thus did not constitute vertical price fixing. *Cf. H & B Equipment Co. v. International Harvester Co.*, 577 F.2d 239, 246 (5th Cir.1978)

## B. *Tying Arrangement*

Plaintiffs contend that defendants saddled them with an illegal tying arrange-ment by setting a $525 maximum price for Earth Station's warranties, forcing them to accept an unwanted term in their contract with First National Bank.

Defendants argue that an illegal tying arrangement cannot exist without the sale of two or more "different" products or services. They contend that they could not illegally have tied the sale of one product or service to plaintiffs to that of another because they never sold *anything* to plaintiffs. They further contend that they put only one product, consumer financing, on the market, and that the complaint alleges no "different" tied product or service.

■ The Court agrees with defendants. A tying arrangement in violation of Section 1 of the Sherman Act or Section 3 of the Clayton Act "may be defined as an agreement by a party to sell one product but only on condition that the buyer also purchase[s] a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Northern Pacific Ry. v. United States*, 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958) (footnote omitted). An offending party ties one product to the sale of a different product, or requires that the buyer not purchase a particular different product from any other supplier. *See Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953).

■ Plaintiffs do not allege that defendants provided them with *any* product or service. First National Bank provided only one product to anyone, credit to consumers. It did not tie the availability of credit to any other product or service. The complaint thus fails to state facts sufficient

---

**11.** Plaintiffs point to *Malley-Duff & Assoc. v. Crown Life Insurance Co.*, 734 F.2d 133 (3d Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 564, 83 L.Ed.2d 505 (1985) to show that a vertical restraint can be a per se antitrust violation if adversely affects an established horizontal market. While instructive, *Malley-Duff* is inapposite to the present case, where plaintiffs allege that they alone participated in the assertedly relevant market. Here no established horizontal market exists.

**12.** Absent coercion after the first 180 days, if plaintiffs continued to acquiesce under the contract and knowingly participated in a combination or conspiracy to fix prices in violation of Section 1, they would have been *in pari delicto* with defendants. In such a case the Court would not entertain price-fixing claims against their co-conspirators.

to support plaintiffs claim that defendants thrust upon them an illegal tying arrangement.

### C. *Exclusive Dealing*

Plaintiffs contend that the Operating Agreement's requirement that Satellite Financial submit credit applications to First National Bank for approval or rejection, before submitting them to any other lender, amounted to illegal exclusive dealing.[13] Defendants contend that the Operating Agreement specifically allows Satellite Financial to submit applications to other lenders and, at most, the bank had a limited right of first refusal that did not violate the antitrust laws. Plaintiffs counter that the provision effectively kept them from dealing with anyone but First National Bank, because no other lender likely would approve applications that First National Bank had rejected.

Plaintiffs' exclusive dealing claim fails for two reasons: first, because the Operating Agreement gave First National Bank no more than a contractual right of first refusal that does not violate the antitrust laws; and second, because plaintiffs allege that defendants monopolized or attempted to monopolize a market that simply does not exist.

#### 1. *Right of First Refusal*

Although an overarching contractual right of first refusal might constitute illegal exclusive dealing, a limited right of first refusal, by itself, generally will not. *See Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 585 F.2d 821, 829 (7th Cir.1978). Illegal exclusive dealing results when a contract is conditioned upon the agreement of one party not to deal with the other party's competitors. It necessarily has the anticompetitive effect of *foreclosing* opportunity to competitors from a substantial share of the line of commerce affected. *Standard Oil Co. of California v. United States*, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949) (emphasis added).

Here the Operating Agreement allowed Satellite Financial to submit credit applications to other lenders, in situations where First National Bank approved loans, whenever a borrower rejected the bank's financing terms. The complaint does not allege that anything prevented Satellite Financial from establishing relationships with other lenders who would compete with First National Bank, albeit initially subject to First National Bank's right of first refusal, by offering better financing terms.[14] Nor does it allege that the bank exercised its right of first refusal in a manner that sought to illegally restrict competition.

The Operating Agreement allowed plaintiffs to deal with competing sources of funding. This means that the limited contractual right of first refusal it contained did not constitute illegal exclusive dealing. The potential for competition would have tended to keep First National Bank's loan terms competitive, so the contractual provision would not harm consumers. Plain-

---

**13.** The Operating Agreement provides, in pertinent part: Until the termination hereof in accordance with the provisions of Section 8 below, Firm [Satellite Financial] shall not submit CAPS [Consumer Credit Applications] to secure financing for the retail purchase of satellite dish receiving systems to any person or company other than Bank [First National] provided, however, that Firm may submit any CAPS to any person or company other than Bank (a) which has been rejected by Bank, or (b) if the prospective Borrower with respect to such CAP has rejected the financing terms offered by Bank. O.A. ¶ 1.

Plaintiffs appear also to allege exclusive dealing in connection with defendants' alleged relationships with TVRO dealers. The complaint is devoid of any factual allegations that would support such a claim, and the Court will not consider it.

**14.** The Operating Agreement's termination provisions meant that Satellite Financial could have submitted applications initially to whomever it chose 180 days after giving First National Bank notice of its intention to terminate the agreement. During the 180-day notice period, once First National Bank had approved an application and offered its financing terms to the borrower, Satellite Financial or the TVRO dealer could have made known to the borrower the existence of alternative, competing sources of credit.

tiffs' apparent decision not to secure secondary financing sources will not convert a valid, limited contractual right of first refusal into an antitrust violation.

### 2. Market Definition

Even if First National Bank's right of first refusal constituted exclusive dealing, no matter how competitive or noncompetitive the terms offered by the bank, TVRO purchasers always could obtain loans independently. This ever-present, independent-financing option leads the Court to consider the propriety of the market supposedly affected by the alleged exclusive dealing.

Plaintiffs define the relevant market as that for financing, or for the brokerage of financing, consumer purchases of TVRO equipment. Defendants claim that the only relevant market in which they participated is that for consumer credit. They contend that plaintiffs' definition of the relevant market is patently wrong and that the Court should dismiss the exclusive-dealing claims at this time. Plaintiffs argue that the correctness of the alleged market is irrelevant for testing the sufficiency of the complaint.

■ An exclusive dealing contract is not a *per se* violation of the antitrust laws. *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 628, 5 L.Ed.2d 580 (1961). Defendants actions must have had a significant anticompetitive effect upon the relevant market before any exclusive dealing can be said to have violated either Section 1 of the Sherman Act of Section 3 of the Clayton Act. *Brown Shoe Co. v. United States*, 370 U.S. 294, 329, 82 S.Ct. 1502, 1526, 8 L.Ed.2d 510 (1962), *Standard Oil*, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371. Although dismissal for improper market definition usually awaits resolution of factual questions, the Court can dismiss claims under Section 1 of the Sherman Act and Section 3 of the Clayton Act when defendants' allegedly anticompetitive activities cannot, as a matter of law, significantly affect any relevant market.

Plaintiffs rely on *Arthur Murray, Inc. v. Reserve Plan, Inc.*, 406 F.2d 1138 (8th Cir. 1969), to support their narrow market definition and to establish that a product can define a market for its own financing. In *Arthur Murray*, the court upheld civil antitrust liability when the relevant market consisted only of financing one chain of dance studios' lessons. But *Arthur Murray* is simply not *en pointe*. The Court declines to follow plaintiffs' lead as they attempt to waltz past the requirement that they allege a market that is relevant.[15]

Plaintiffs profess that an individual product can determine its own national credit market. This argument presupposes that a single lender, absent control over the seller of an item financed, or contractual arrangements with that seller, can monopolize or attempt to monopolize the market for unsecured financing of that item.

Plaintiffs' theory calls for the fragmentation of the enormous, extremely competitive, national, consumer-credit market into distinct submarkets defined by items financed, not the availability of capital and demand for loans.[16] But credit markets do not work this way. No one lender can survive in a "market for financing a particular product" if it does not remain competitive with the credit markets as a whole.

A lender who offers noncompetitive financing of a particular product invites purchasers to turn to any of the myriad, alternative sources of credit. For example, if a furniture retailer offers to finance a purchase at an annual interest rate of 19 percent, the buyer instead might obtain a 12

---

**15.** In *Arthur Murray*, a franchiser allowed its franchises to accept financing only from particular sources. A parallel situation would exist here if defendants somehow restricted TVRO dealers from selling equipment to buyers who financed their purchases unless First National Bank gave the loan. Nothing like that exists here.

**16.** New consumer installment debt in 1985 totaled an estimated $100 billion. H. Kaufman and J. Hanna, *Prospects for Financial Markets in 1986*, at 15. (Salomon Brothers Inc. report, Dec. 18, 1985).

percent installment-credit line from his bank and draw on it to pay for the furniture.

The aggregate demand for credit from purchasers of any one product soon will entice lenders to market loans to them. Competition ensues, and the supposed "market" for financing one product rapidly becomes visibly integrated with the larger consumer credit market of which it always was a part. A lender with a toehold in a "market for financing a particular product" who offers "competitive" financing terms might, as a consequence, maintain a generous share of that "market". The "competitive" financing terms result not from within that "market", however, but from the larger, national, consumer credit market.

■■ Current national marketing of consumer installment credit [17] has made the multibillion-dollar, extremely competitive, national market for consumer installment credit the narrowest relevant consumer credit market for antitrust purposes. The complaint does not allege, nor could it, that defendants monopolized or attempted to monopolize the national consumer-installment-credit market.

### C. Section 3 of the Clayton Act

■■ Plaintiffs' claims under Section 3 of the Clayton Act fail because credit transactions are not within the ambit of the act. Section 3 proscribes anticompetitive activities by "any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities." 15 U.S.C. § 14 (1982). Money is not a "commodity" for Section 3 purposes, and extensions of

credit, even if the credit will be used to purchase goods, are not within the scope of Section 3 of the Clayton Act. *Anderson v. Home Style Stores, Inc.*, 381 F.Supp. 402, 407 (E.D.Pa.1974), *aff'd.*, 511 F.2d 1392 (3d Cir.1975); *Wendkos v. ABC Consolidated Corp.*, 379 F.Supp. 15, 17–18 (E.D.Pa.1974); *United States v. Investors Diversified Services, Inc.*, 102 F.Supp. 645, 648 (D.Minn. 1951). The loan transactions alleged in the complaint thus cannot form the basis of an antitrust claim under Section 3.

In sum, the facts set forth in the complaint do not state a claim under any of plaintiffs' antitrust theories. The Court can ascertain no harm to consumers from defendants alleged activities, and accordingly will dismiss count two.

### V. Contract Claims

Count Three alleges breach of contract by all three defendants. Count Four alleges breach of implied contract.[18] Commercial Credit and Control Data contend that they cannot be liable either expressly or impliedly for breach of a contract to which they were not a party. They further contend that the complaint does not allege sufficient facts to allow the Court to pierce any corporate veil or disregard defendants' separate existence as three distinct entities. They also contend that Earth Station was not a party to any agreement, and thus has no claim for relief.

As to count Four, Commercial Credit and Control Data additionally contend that the complaint neither states directly that there existed, nor alleges facts to support the existence of, an implied contract between plaintiffs and Commercial Credit or Control Data.

---

**17.** Delaware recently has become a center for national marketing of unsecured lines of consumer credit in the form of credit cards. The state's recent repeal of usury laws, *see* The Financial Center Development Act, 63 Del.L. c. 2 (1981) has attracted many out-of-state bank credit-card operations to Delaware. For example, the Greenwood, Delaware (pop. 600) Trust Company, a member of the "Sears Financial Network", presently is engaged in a nationwide marketing campaign for its "Discover" card. The parties briefs and the complaint indicate

that to some degree First National Bank is to Commercial Credit what Greenwood Trust Company is to Sears, that is, both provide vehicles by which their parent companies market consumer credit.

**18.** Only Commercial Credit and Control Data have moved to dismiss plaintiffs' two contract claims. First National Bank does not challenge either counts Three or Four.

Plaintiffs claim that the allegations contained in the complaint state claims against Commercial Credit and Control Data under at least five legal theories: corporate veil-piercing, equitable estoppel, detrimental reliance, fraud and agency. Plaintiffs contend that Commercial Credit and Control Data actively participated in negotiations that led to the Operating Agreement. They claim that the bank acted at all times as a mere instrumentality of Commercial Credit and Control Data, under their actual and total control. From this they reason that Commercial Credit and Control Data need not have signed the agreement to be liable for its breach.

Plaintiffs also contend that Earth Station was an intended third-party beneficiary of the Operating Agreement, which contemplated loans for the purchase of Earth Station warranties and services contracts. They further contend that the complaint alleges sufficient facts to state a claim that defendants violated an implied covenant that First National Bank review each credit application submitted by plaintiffs in accordance with reasonable commercial standards.

■■■■ The Court need examine no more than plaintiffs' agency theory to deny Commercial Credit's and Control Data's motion to dismiss Counts Three and Four. Knowledge and actions of a corporation's agent ordinarily are imputed to the corporation when the agent acts on the corporation's behalf. Whether an agency relationship exists between parent and subsidiary is a question of fact. The central factual issue is control, that is, whether the parent corporation dominates the activities of the subsidiary. *Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc.*, 456 F.Supp. 831, 840–41 (D.Del.1978).

■■■ The complaint alleges that Commercial Credit and Control Data dominated and controlled First National Bank. These allegations suffice for plaintiffs to have stated breach of express and implied contract claims against Commercial Credit and Control Data based upon an agency theory. The question of control, central to the determination of the agency issue, cannot be resolved in this motion to dismiss.

Earth Station similarly has alleged sufficient facts to support its third-party-beneficiary theory. Plaintiffs will be given the opportunity to discover facts necessary to prove their contract claims.

## VI. Breach of Fiduciary Relationship

Count Five alleges that all three defendants breached their fiduciary duties to plaintiffs.[19] Defendants contend that only an arms-length contractual relationship existed between Satellite Financial and First National Bank, and that it did not establish any fiduciary duty on their part.

Plaintiffs characterize their relationship with defendants as more than contractual. They contend that defendants were plaintiffs' agents, in that plaintiffs created a TVRO financing and warranty program and selected defendants to provide services to their TVRO customers. They alternatively characterize their relationship with defendants as that of joint venturers or partners in developing a new business for stated, anticipated benefit of all parties. Plaintiffs also call themselves defendants' customers, in that plaintiffs sought services from defendants and in return agreed to provide valuable consideration.

Plaintiffs contend that a fiduciary relationship arises because defendants "occupied a position out of which the duty of good faith ought in equity and good conscience ... arise." Pl.Br. at 27. They state that the complaint alleges the following, which together give rise to a fiduciary relationship: Defendants actively participated as dominant parties in negotiations leading to the contract. In the course of the negotiations and later, defendants repeatedly made representations and assurances to plaintiffs. Defendants knew that plaintiffs relied on them and had reposed in

---

**19.** Plaintiffs claim liability on the part of First National Bank directly, and on the part of Commercial Credit and Control Data either directly or under the corporate veil-piercing theories described earlier.

them their trust and confidence. Plaintiffs entered into and performed agreements in reliance of defendants' representations and assurances.

The Court agrees with defendants. Under Delaware law, a contract, in itself, does not impose fiduciary duties on the contracting parties. Even if the contract shows that plaintiff placed a "quantum of trust" in a defendant that the defendant accepted, no fiduciary relationship can exist without superiority on the part of the defendant. *Cheese Shop International, Inc. v. Steele*, 303 A.2d 689–90 (Del. Ch.), *rev'd. on other grounds*, 311 A.2d 870 (Del.1973). The complaint alleges no claim of superiority on First National Bank's part, nor does it allege facts sufficient to support such a claim.

Similarly, plaintiffs were not defendants' principals. An agent must act both on the principal's behalf and be subject to the principal's control. The Operating Agreement required no defendant to act subject to either plaintiff's control. As a general proposition, a principal is responsible for the acts of his agent done in course of his employment. The Operating Agreement specifically states that Satellite Financial would not be responsible for any acts of First National Bank.

The Operating Agreement also created no partnership or joint venture between plaintiffs and defendants.[20] The Uniform Partnership Act, which Delaware has adopted, defines a partnership as an association of two or more persons to carry on a business for profit as co-owners. 6 Del.C.Ann. § 1506 (1974). Each partner must have the power of ultimate control over the business. Unif.Ptrshp.Act § 6, Comment 1, 6 U.L.A. 1, 23 (1969). Here the Operating Agreement plainly describes Satellite Financial as an "independent contractor," O.A. at ¶ 7. It gave plaintiffs no control over any of First National Bank's activities.

Nor does a fiduciary relationship arise from plaintiffs' asserted relationship as First National Bank's customer. Plaintiffs simply were not customers for banking services in any usual sense. A fiduciary relationship between a bank and its customer can arise under certain limited circumstances, but not, as in this case, when the bank and another party merely enter into an arms-length contract.

The Court accordingly will dismiss Count Five.

## VII. Tort Claims

### A. Tortious Interference with Business Relationships

Count Six alleges that defendants tortiously interfered with plaintiffs' existing contractual relationship with First National Bank by inducing the breach of that relationship. Plaintiffs also contend that, in order to destroy plaintiffs' businesses and good names, defendants interfered with plaintiffs' existing and prospective relationships with TVRO dealers and purchasers, pirated plaintiffs' network of TVRO dealers and consumers and interfered with the price of Earth Station's warranty contracts. Plaintiffs claim that as a result they suffered actual damages for lost good will and business opportunity, as well as the appropriation and eventual destruction of a viable business in a new market.

First National Bank contends that it could not have interfered tortiously with a contractual relationship to which it was a party. Commercial Credit and Control Data similarly contend that, because they are potentially liable for breach of contract, they too cannot be liable for tortiously interfering with the contract.

First National Bank is correct, and the Court will dismiss count Six against it. The court also will grant Commercial Credit's and Control Data's motion to dismiss count Six because the complaint lacks sufficient facts to state a tortious interference claim.

---

20. A joint venture is a partnership limited in its scope and duration. *See First Mechanics Bank v. Comm'r. of Internal Revenue*, 91 F.2d 275, 278 (3d. Cir.1937).

■ Maryland law recognizes the tort of malicious interference with business relationships. *Beane v. McMullen*, 265 Md. 585, 291 A.2d 37, 46–47 (1972). This cause of action contains four elements: "(1) intentional and wilful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting." *Id.*, 291 A.2d at 47.

■ The tort requires that a party intentionally induce *another* to breach an existing contract. The bank cannot tortiously have induced itself to breach its contract with plaintiffs.

The Court need not decide whether similar logic would apply to the tort claims against Commercial Credit and Control Data (because they also may be liable for breach of contract). The complaint simply fails to allege the elements of the tort.

■ The pertinent part of Count Six contains the following: "[A]s set forth above, [defendants] committed overt acts which did prevent plaintiffs from realizing benefits from the above-described business opportunities." Complaint ¶ 65. The words "as set forth above" apparently refer to the twenty-seven paragraph, fourteen-page general factual allegations, through which the Court had to search for applicable "overt acts." The Court's search revealed no facts that establish how defendants acted in a manner detrimental to plaintiffs' business relationships with third parties. The Court accordingly will dismiss Count Six for failure to set forth a legally cognizable claim for malicious interference with business relations.

### B. *Fraud and Deceit*

Count Seven alleges that defendants engaged in statutory mail and wire fraud as well as common law fraud. Defendants assert that plaintiffs have not pleaded circumstances constituting fraud with particularity, and thus have failed to satisfy Fed. R.Civ.P. 9(b).[21] They contend that the complaint fails to allege any false representations made by Control Data to defraud plaintiffs, and that it does not sufficiently detail representations made by Commercial Credit. They further contend that the only representation allegedly made by First National Bank, that the bank would perform its contractual obligations, were not fraudulent.

Plaintiffs counter that the complaint easily meets their burden of pleading fraud with particularity and alleges all elements necessary for a claim of affirmative fraud under Maryland law. They consider the absence of allegations of false representations made by Commercial Credit or Control Data irrelevant to their claim, and assert that the complaint as a whole alleges a conspiracy by defendants to defraud plaintiffs. They contend that Commercial Credit and Control Data reasonably can be expected to have known of their subsidiaries' activities and to have directed them.

The Court finds that the complaint fails to allege fraud with sufficient particularity to withstand a motion to dismiss under Fed.R.Civ.P. 9(b). Pleading standards for fraud claims harmonize Rule 9(b)'s particularity requirement with the rules' general requirements of notice pleading. *See* Fed. R.Civ.P. 8. Indeed, "focusing exclusively on [Rule 9(b)'s] 'particularity' language is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules." *Christidis v. First Pennsylvania Mortgage Trust*, 717 F.2d 96, 100 (3d Cir.1983), (quoting 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1298, at 407 (1969)). Nonetheless,

Rule 9(b) requires plaintiffs to plead with particularity the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise miscon-

---

**21.** Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally. Fed.Civ.P. 9(b).

duct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior. [A]llegations of 'date, place or time' fulfill these functions, but ... [p]laintiffs are free to use alternative means of injecting *precision and some measure of substantiation* into their allegations of fraud.

*Seville Indus. Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 791 (3d Cir.1984) (emphasis added).

▆▆ In *Seville,* the plaintiff identified the subject of the fraud with "great specificity." For this reason the complaint survived a Rule 9(b) challenge despite the lack of detail concerning the alleged misrepresentation. 742 F.2d at 791. Here the complaint's general description of the nature and subject of defendants' alleged misrepresentations stands alone.[22]

Plaintiffs again ask the Court to parse prior pages of potentially "particular" factual allegations, this time to divine circumstances that might allege mail fraud, wire fraud or common law fraud. For example, count seven directs the Court's attention, "but not by way of limitation," to the three-and-one-half-page set of general allegations in Paragraph 32, for "specific acts which constitute and evidence fraud." Complaint ¶ 70. Plaintiffs' brief similarly directs the Court to two pages of allegations concerning negotiations that led to the Operating Agreement. Pl.Br. at 31, 32, *see* complaint ¶ 24, 25. Multiple readings of the entire complaint fail to reveal sufficiently precise or measurably substantiated allegations of circumstances of fraud for plaintiffs to have satisfied Rule 9(b)'s particularity requirement.

Maryland substantive law sets forth the elements of fraud applicable to this claim. The cause of action for fraud or deceit under Maryland law contains five elements:

(1) the making of a false representation of past or existing fact; (2) which is either actually known to be false or made with reckless indifference to truth; (3) for the purpose of defrauding the party claiming injury; (4) reasonable reliance upon the statement to the detriment of the plaintiff; and (5) damage directly resulting from the fraudulent misrepresentation. *Equitable Trust Co. v. G & M Construction Corp.*, 544 F.Supp. 736, 743 (D.Md.1982); *Martens Chevrolet, Inc. v. Seney*, 292 Md. 328, 439 A.2d 534, 537 (1982).

▆▆ Rule 9(b) allows a plaintiff to aver generally the second and third of these elements, which involve a defendant's state of mind. Circumstances that constitute the remaining elements, if alleged on information and belief, generally will not satisfy Rule 9(b)'s particularity requirement. *See* J. Moore, 2A *Moore's Federal Practice*, ¶ 9.03 at 9–26 (1985). Conclusory statements without supporting factual allegations similarly will not suffice. Most of plaintiffs' allegations that purport to constitute circumstances of fraud are alleged on information and belief, *see* Complaint ¶ 32, or, are conclusory, *see* complaint ¶ 70 ("Plaintiffs were damaged as intended by the fraudulent acts of defendants."). As such they do not satisfy Rule 9(b).

The complaint also fails to allege plaintiffs' justifiable reliance such that any fraudulent misrepresentations made to them proximately caused damages claimed. Without plaintiffs' reasonable reliance upon defendants' misrepresentations *and* damage directly resulting from the misrepresentations, no fraud occurred under Maryland law. Plaintiffs have not stated with even minimum particularity circumstances that allege either of these elements of the tort.

Plaintiffs fail to allege any representations made by Control Data. It is not

---

**22.** For example, the thrust of plaintiffs' fraud claims appears in the complaint ¶ 25, as follows:
"Said employees of First National and Commercial Credit repeatedly represented to and assured Mr. Young that Commercial Credit would not compete with Satellite Financial Delaware or its assigns. Indeed, Satellite Financial Delaware and Satellite Financial relied on those representations and assurances. Indeed, Satellite Financial and Mr. Young spent substantial sums in reliance on those assurances."

enough under Rule 9(b) for plaintiffs merely to assert in their brief that Control Data must have known of its subsidiaries' misrepresentations. *See* Pl.Br. at 33.

The Court accordingly will grant defendants' motion to dismiss Count Seven.

### C.  Trade Defamation

Defendants contend that the complaint fails to allege any elements of the tort of trade defamation claimed in Count Nine. They assert that the complaint does not plead publication, disparaging innuendo or falsity, and that it alleges no statements by defendants which did or could have injured plaintiffs. They also state that the complaint fails to allege special damages, a requisite element of the tort under Maryland law.

Plaintiffs contend that they have alleged sufficiently facts capable of supporting a reasonable inference of defamatory statements made by defendants to TVRO dealers. They contend that the complaint read as a whole clearly shows that defendants told TVRO dealers that plaintiffs would not or could not perform services promised, a falsehood central to defendants' plan to usurp plaintiffs' businesses. Plaintiffs argue that, because defendants made the statement out of plaintiffs' hearing, the facts pertinent to this claim are within defendants' peculiar knowledge. They thus ask the Court to relax the usual pleading requirements.

Plaintiffs also contend that Commercial Credit and Control Data are liable for statements made by their employees, and additionally as principals for statements made by officers or employees of First National Bank, which acted as the agent of Commercial Credit and Control Data.

■ Maryland law recognizes the tort of trade defamation as the knowing, reckless or negligent communication of a falsehood to a third person resulting in actual out-of-pocket injury to the business defamed. *Beane,* 291 A.2d at 49 (*quoting* W. Prosser, *Law of Torts,* at 919–20 (4th ed.

1971)); *Jacron Sales Co., Inc. v. Sindorf,* 276 Md. 580, 350 A.2d 688, 697–98 (1975); *Metromedia, Inc. v. Hillman,* 285 Md. 161, 400 A.2d 1117, 1123 (1979).

■ Once again, plaintiffs bid the Court to sift through the complaint's plethoric paragraph 32 to ascertain facts that might support their claim. Neither there nor anywhere in the complaint could the Court find allegations of statements allegedly made by defendants which did, or could have, injured plaintiffs. Nor do plaintiffs mention any communication to third parties who interpreted defendants' statements in a manner that resulted in damage to plaintiffs' businesses.

Plaintiffs also fail to allege "special damages," their actual out-of-pocket injury caused by the alleged defamation. *See Metromedia,* 400 A.2d at 1123. The complaint alleges that Satellite Financial received income from First National Bank, but not from any other source. It does not describe any third party who had provided income to plaintiffs but who no longer carried on business with Satellite Financial because of defendants' misrepresentation.

The Court accordingly will dismiss count nine for failure to allege sufficient facts to state a claim of trade defamation under Maryland law.

### VIII.  RICO

Count Eight alleges that defendants violated the Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968 (1982). The complaint alleges that Commercial Credit and Control Data operated an enterprise, First National Bank, through which they participated in a pattern of racketeering activity, which consists entirely of the fraud and conspiracy to commit fraud alleged in Count Seven.

■ Plaintiffs rely exclusively on the recent Supreme Court decision in *Sedima, S.P.R.L. v. Imrex Co., Inc.,* —— U.S. ——, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) to support their claim. As with Count Seven, however, the Court will dismiss plaintiffs' RICO claim for failure to state with sufficient particularity the circumstances consti-

tuting the underlying fraud. *See Seville*, 742 F.2d at 790–91; *see generally* D. Abrams, *The Place of Procedural Control in Determining Who May Sue or be Sued: Lessons in Statutory Interpretations from Civil RICO and Sedima*, 38 Vand.L. Rev. 1477, 1527–29 (1985).[23]

### IX. Financial Privacy

Count Ten alleges that defendants violated plaintiffs' statutory and common law rights to financial privacy. In support of this claim, plaintiffs again characterize themselves as "customers" of First National Bank. They contend that the bank had an obligation to maintain as confidential any information supplied to it as part of a bank/customer relationship. They allege that Commercial Credit and Control Data induced the bank into furnishing plaintiffs' confidential information to them so that they could compete with plaintiffs and pirate plaintiffs' TVRO dealers and customers. In particular, plaintiffs claim that First National Bank furnished Commercial Credit and Control Data with individual credit applications, which in toto revealed plaintiffs' dealer network and customers generated through it.

Defendants assert that plaintiffs were not "customers" of First National Bank, but even if they were, they contend that only contractual rights arose from their relationship. Defendants claim moreover that the Operating Agreement, which forms the basis of the contractual relationship, contemplated the bank's disclosure of the information to Commercial Credit and Control Data. Defendants contend that they could not have violated any right to financial privacy by revealing information that they were expressly authorized to disclose.

■ The Court finds merit in defendants' contentions. Unlike depositors or clients of a bank's trust services, plaintiffs were not First National Bank's customers in any usual sense. *See supra* Section V. The relationship between plaintiffs and the bank arose from an arms-length contract, the Operating Agreement, which essentially established Satellite Financial as a broker of consumer loans made by First National Bank. A right to privacy, distinct from contractual rights, does not attach to all contracts into which a bank enters simply because a bank qua bank is a party to the contract. No such right of privacy attaches here. Plaintiffs' remedy for breach of confidentiality or for the bank's misuse of information provided to it under the Operating Agreement lies in contract.

■ Even if plaintiffs had a separate right to financial privacy, the terms of the Operating Agreement contemplated that Commercial Credit and Control Data would sell insurance to borrowers, and implicitly authorized First National Bank to disclose credit application information to them. O.A. at ¶ 5. Although the agreement contemplated Commercial Credit and Control Data would use the information only to solicit and sell insurance, this provision forecloses any liability on the part of the bank for disclosure of that information. To the extent defendants used the information in violation of the Operating Agreement, plaintiffs' remedy again lies in contract.

The Court accordingly will dismiss Count Ten.

### X. Conclusion

The Court will grant defendants' motions to dismiss, without prejudice, Counts Two, Five, Six, Seven, Eight, Nine and Ten. Counts Three and Four will survive. Count One was not challenged at this time.

---

**23.** Had plaintiffs satisfied Fed.R.Civ.P. 9(b), their RICO claims likely still would have failed. The complaint alleges a RICO "enterprise" consisting entirely of wholly-owned or nearly-wholly-owned subsidiaries. Such related entities can conspire in violation of RICO no more than they could for antitrust purposes under *Copperweld*. In addition, the alleged "pattern of racketeering activity" against a single set of victims may lack sufficient differentiation to suggest the complexity and continuity required to create a RICO pattern. *Paul S. Mullin & Associates, Inc. v. Basset*, 632 F.Supp. 532 (D.Del.1986); *see Kredietbank, N.V. v. Joyce Morris, Inc.*, No. 84–2903 (D.N.J. Jan 6, 1986).

An order will enter in accordance with this opinion.